1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2


3


4                                        )
    UNITED STATES OF AMERICA,            )
5                                        )
              Plaintiff,                 )   Criminal Action
6                                        )   Nos. 1:19-cr-10459-RWZ-20
    v.                                   )         1:19-cr-10459-RWZ-48
7                                        )
    ANGEL ORTIZ and JEREMIA MEDINA,      )
8                                        )
              Defendants.                )
9                                        )


10


11              BEFORE THE HONORABLE JUDITH G. DEIN
                   UNITED STATES MAGISTRATE JUDGE
12


13
                        DETENTION HEARING
14


15
                       December 19, 2019
16


17
              John J. Moakley United States Courthouse
18                     Courtroom No. 15
                       One Courthouse Way
19               Boston, Massachusetts 02210


20


21
                       Linda Walsh, RPR, CRR
22                     Official Court Reporter
              John J. Moakley United States Courthouse
23               One Courthouse Way, Room 5205
                   Boston, Massachusetts 02210
24                   lwalshsteno@gmail.com


25

```
1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Glenn A. MacKinlay
4         One Courthouse Way
          Boston, Massachusetts 02210
5         617-748-3215
          glenn.mackinlay@usdoj.gov
6
     On Behalf of the Defendant Angel Ortiz:
7
          SHEA & LAROCQUE
8         By: Mark W. Shea, Esq.
          929 Massachusetts Avenue, Suite 200
9         Cambridge, Massachusetts 02139
          617-577-8722
10        markwshea@gmail.com

11   On Behalf of the Defendant Jeremia Medina:

12        RAYMOND E. GILLESPIE, Esq.
          875 Massachusetts Avenue, Suite 32
13        Cambridge, Massachusetts 02139
          617-661-3222
14        rgillespie1@prodigy.net

15

16
               Proceedings recorded by sound recording and
17               produced by computer-aided stenography

18

19

20

21

22

23

24

25
```

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CRAIG RYAN HARVEY | | | | |
| By Mr. MacKinlay | 5 | | | |
| By Mr. Gillespie | | 40 | | |
| By Mr. Shea | | 49 | | |

E X H I B I T S

| | DESCRIPTION | RECEIVED |
|---|---|---|
| GOVERNMENT EXHIBITS | | |
| 1 | Detention affidavit of Dominic Coppo........... | 12 |
| 2 | Disk containing excerpted audio/video.......... | 15 |

| | DESCRIPTION | RECEIVED |
|---|---|---|
| DEFENDANT EXHIBITS | | |
| 3 | Time sheet regarding Mr. Ortiz from Marcello's. | 85 |

1           P R O C E E D I N G S

2           (Recording begins at 10:22:15)

3           THE CLERK:  The District Court for the District of

4    Massachusetts is now in session, the Honorable Judith G. Dein

5    presiding.  This is Criminal Action 19-10459, *United States*

6    *versus Angel Ortiz and Jeremia Medina*.

7           Would counsel please identify yourselves for the

8    record.

9           MR. MacKINLAY:  Good morning, Your Honor.  Glenn

10   MacKinlay on behalf of the government.  With me, with the

11   Court's permission, is Michelle Donnelly, who is a telephone

12   specialist in our office.

13          THE COURT:  Thank you.  Welcome.

14          MR. GILLESPIE:  Good morning, Your Honor.  Ray

15   Gillespie on behalf of Mr. Medina, seated to my left at counsel

16   table.

17          MR. SHEA:  Good morning, Your Honor.  Mark Shea for

18   Angel Ortiz, who is standing to my right.

19          THE COURT:  Okay.  Have a seat.  We're scheduled for a

20   detention hearing.  Is everybody ready to proceed?

21          MR. GILLESPIE:  Yes.

22          MR. MacKINLAY:  Yes, Your Honor.

23          MR. SHEA:  Yes, Your Honor.

24          U.S. PROBATION:  I was going to give you this from

25   Probation, if it's okay.

 1          THE COURT:  Okay.  All right.  Please call your first

 2   witness.

 3          MR. MacKINLAY:  The government calls Craig Harvey.

 4          THE CLERK:  Raise your right hand.

 5          (Witness sworn.)

 6          THE WITNESS:  I do.

 7          THE CLERK:  Please state your full name and spell your

 8   last for the record.

 9          THE WITNESS:  Craig Ryan Harvey, H-a-r-v-e-y.

10          THE COURT:  Proceed.

11          CRAIG RYAN HARVEY, having been duly sworn by the

12   Clerk, was examined and testified as follows:

13                          DIRECT EXAMINATION

14   BY MR. MacKINLAY:

15   Q.   Good morning.  Where do you work, sir?

16   A.   I am currently employed at the FBI in Boston.

17   Q.   How long have you worked there?

18   A.   I've worked there since November of 2018.

19   Q.   And what do you do at the FBI?

20   A.   I'm on the North Shore Gang Task Force.

21   Q.   Describe briefly your duties and responsibilities with the

22   task force.

23   A.   Since I've come to the FBI in Boston, I was assigned to

24   the task force, specifically in the investigation titled

25   "Operation Throne Down" which is investigating the Latin Kings

1    in the State of Massachusetts.

2    Q.    What did you do prior to working with the FBI?

3    A.    I was a special agent with Army Criminal Investigation

4    Command investigating various felony offenses to include sexual

5    assaults, death investigations, fraud as well as several

6    overseas protective operation missions.

7    Q.    How long did you work with the Army CID?

8    A.    I was an agent with Army CID for approximately five years.

9    Q.    Through the course of your work on the Latin Kings

10   investigation with the task force, have you become familiar

11   with the Latin Kings?

12   A.    Yes, I have.

13   Q.    Can you describe how or the sources of your information

14   and knowledge concerning the Latin Kings?

15   A.    The source of my information, we have various sources of

16   information at the FBI to include cooperating witnesses, audio

17   and video recordings made by cooperating witnesses, T-III wire

18   intercepts as well as Open Source searches and other police

19   reports as well.

20   Q.    Have you had the opportunity to discuss the investigation

21   with other agents and officers working on it?

22   A.    Yes, I have.

23   Q.    Have you also had an opportunity to read reports of other

24   agents and officers working on the investigation?

25   A.    Yes, I have.

1   Q.   And based upon all of that and your own personal work on

2   the case, are you familiar with the structure of the Latin

3   Kings gang?

4   A.   Yes, I am.

5   Q.   Briefly describe it for the Court.

6   A.   The Latin Kings are a very organized gang.  The

7   structure -- I'll focus on Massachusetts as it pertains to this

8   investigation.  So specifically Massachusetts has a state

9   leadership that consists of an Inca, a cacique, an enforcer, a

10  treasurer and a secretary.  That -- the state also has two

11  regional offices that cover the different regions of

12  Massachusetts, and then each chapter has their own leadership

13  that mirrors the state leadership throughout the city.

14  Q.   And are there chapters of the Latin Kings, according to

15  your investigation, in both New Bedford and Boston?

16  A.   Yes, there is.

17  Q.   Describe that.

18  A.   So specifically as it relates to Boston, the only --

19  actually, there's two current Boston chapters.  It would be

20  D5K, the Devon Street Kings, the longest chapter that's been

21  upstanding in Boston, as well as the Morton Street Bricks,

22  which is a more recent chapter of the Latin Kings in the Boston

23  area.

24          As it pertains to New Bedford, the New Bedford

25  chapter is one of the largest and strongest chapters of the

1  Latin Kings in Massachusetts and has been for some time.

2  Q.    In addition to the structure of the particular chapters,

3  are there rules that are to be followed as a requirement of

4  being a member of the Latin Kings?

5  A.    Yes.  So the Latin Kings adhere to the king manifesto,

6  which is their constitution or bible.  It describes what it

7  means to be a Latin King, how you're supposed to conduct

8  yourself, and additionally, each state has their own bylaws by

9  which the members are supposed to adhere to.

10  Q.    Are there punishments -- a system of punishment for

11  violations of those rules described?

12  A.    Yes.  So there is punishments that are given out as a

13  result of violations of those rules.  Depending on severity,

14  those can consist of violations or beatings, and if the

15  severity of the violation is enough, it can consist all the way

16  up to death.

17  Q.    In addition to the punishments, does violence play a role

18  in the Latin Kings organization?

19  A.    Yes.  So violence is how the Latin Kings operate.  It's

20  how they get things done, whether it's to ensure that members

21  are reporting --

22        MR. SHEA:  Objection.  I mean, that's just such a

23  general statement of -- apparently from my reading of this, the

24  Latin Kings exist in Illinois and Florida and North Carolina,

25  but the idea like that means that every single member --

1          THE COURT:  I think -- this is limited, as I
2    understand it, to Massachusetts.  You're focusing in on
3    Massachusetts; is that correct?
4          THE WITNESS:  Currently, Your Honor.
5          THE COURT:  I'm going to allow the general, and my
6    decision is very much based, though, on the individual
7    defendant's role, if any, in these things, and that will be
8    explored, I assume, on both direct and cross.
9          MR. SHEA:  Thank you.
10         MR. GILLESPIE:  Your Honor, can we have the basis for
11   his information?
12         THE COURT:  He's done some of it.  You can go a little
13   more into it.
14         MR. GILLESPIE:  It's got to be reliable.
15         THE COURT:  Well, I think the confidential witnesses
16   are described in the affidavit somewhat, but....
17         MR. MacKINLAY:  I'll add a little bit more.
18         THE COURT:  Is that your concern?  When you say
19   reliable --
20         MR. GILLESPIE:  My concern is that, as my brother
21   said, it's pretty generalized, although you particularized it
22   at least to the State of Massachusetts, but even so, I mean,
23   it's hearsay.  Of course I know it's admissible but only if
24   it's reliable.
25         THE COURT:  All right.  So you can explain a little

1  more on the basis of your understanding, the background and

2  what you base your understanding of the structure of the Latin

3  Kings on.

4          THE WITNESS:  Yes, Your Honor.

5  A.   So the basis is based on a five-year investigation, which

6  consists of numerous recordings and audio and video that were

7  intercepted as well as T-III wire intercepts, cooperating

8  witnesses, several police reports which were gathered by myself

9  and fellow agents.

10 Q.   In particular, had cooperating witnesses, who they

11 themselves were either present or former Latin King gang

12 members, debriefed and provided to the FBI the structure of the

13 organization?

14 A.   Yes.  Several cooperating witnesses were able to provide

15 both structure as well as individual acts of violence.

16 Q.   You mentioned a detention affidavit.  Are you familiar

17 with Dominic Coppo?

18 A.   Yes, I am.

19 Q.   Who is he?

20 A.   He is the lead case agent on this investigation.

21 Q.   Have you reviewed a document prepared by Dominic Coppo

22 that reflects -- or is titled an "Affidavit of Special Agent

23 Dominic Coppo"?

24 A.   Yes, I have.

25          MR. MacKINLAY:  May I approach the witness, Your

1  Honor?

2       THE COURT:  Yes.

3  Q.   I'm showing you a document and ask you to take a moment

4  and see if you recognize it.

5  A.   Yes, I do.

6  Q.   What do you recognize it to be?

7  A.   This is the detention affidavit of Dominic Coppo.

8  Q.   Have you had an opportunity to review this document?

9  A.   Yes, I have.

10 Q.   To the best of your knowledge, is it fair and accurate in

11 terms of the information provided therein?

12 A.   Yes, it is.

13      MR. MacKINLAY:  Your Honor, I would offer it into

14 evidence as Exhibit Number 1.

15      MR. SHEA:  I only object as to one paragraph -- well,

16 two paragraphs.  Numbers -- Entry Numbers 68 and 69 that

17 say -- the title is "Angel Ortiz," my client.  "King Abby" is

18 in parentheses, and then it goes on to say essentially he's a

19 member of Devon.

20      MR. MacKINLAY:  Excuse me.  What page?

21      MR. SHEA:  I'm sorry.  24.  So it's Page 24,

22 Paragraphs 68 and 69.

23      It says he's a member of the Devon Street Kings, he's

24 been identified by other members, and then it goes on to say

25 that CW-3 and Roldan went to Angel Ortiz's house to cut

1  approximately 100 grams of cocaine.  Angel Ortiz was present

2  and assisted in processing the heroin.

3        The reason I'm objecting to this coming in is I was

4  provided with just short of 900 pages of what we've

5  characterized as *Jencks* material in preparation for this

6  hearing.  Having reviewed those materials, there isn't a single

7  report that indicates this drug transaction or my client -- I

8  mean, the way it reads is he's just present, but anyway,

9  there's not even a report that captures him being present for

10  this.

11        They did debriefs of CW-3, who's referenced in that

12  paragraph.  There's no report of the debrief with him that I

13  can tell, ferret out, that deals with that.

14        THE COURT:  So I'm going to let you -- I'm going to

15  let you explore that, and if that's the way it ends up, renew

16  your motion -- renew your request to strike it.  Okay?  But let

17  me get some basis here, and let me -- I don't want to have the

18  objection be paragraph by paragraph.

19        MR. SHEA:  No, that's the only thing that I was taking

20  out of this.

21        THE COURT:  We can explore -- you can explore whether

22  there is support and what's the basis for that paragraph.

23  Otherwise, I'm accepting it as Exhibit 1.

24        (Government Exhibit 1 received in evidence.)

25  Q.   Does Exhibit 1 contain further details of the structure

1    and procedures utilized by the Latin Kings and then covered

2    during your investigation?

3    A.    Yes, it does.

4    Q.    Did your investigation focus on a target by the name of

5    Jeremia Medina?

6    A.    Yes, it did.

7    Q.    How did you identify him?

8    A.    Jeremia Medina was identified by Cooperating Witness

9    Number 9.

10   Q.    Okay.  And who did you determine Jeremia Medina to be in

11   your investigation?

12   A.    So Jeremia Medina was identified to be King Sweepy, a

13   former Inca of the New Bedford chapter of the Latin Kings and

14   current enforcer prior to the arrests of the New Bedford

15   chapter of the Latin Kings.

16   Q.    What are the duties of an Inca in a chapter and what are

17   the duties of an enforcer in a chapter?

18   A.    So the Inca is the leader of the chapter.  He is

19   responsible for ensuring that all members of the chapter follow

20   the bylaws.  He is responsible for putting out all orders and

21   determining the conduct of all chapter members.

22           The enforcer specifically handles violations,

23   terminations, any violence that needs to be done against rival

24   gangs, cooperating witnesses.  The enforcer's specialty is

25   violence.

1   Q.   During the course of the investigation, you mentioned

2   cooperating witnesses.  Were they provided at various times

3   equipment to audio-video record meetings of chapters?

4   A.   Yes, they were.

5   Q.   In particular, focusing on the New Bedford chapter, was

6   that done with respect to them?

7   A.   Yes, it was.

8   Q.   Are you familiar with the -- with the process and the

9   results of recording of meetings of the New Bedford chapter?

10  A.   Yes, I am.

11  Q.   Have you reviewed a series of recordings more specifically

12  regarding Jeremia Medina?

13  A.   Yes, I have.

14  Q.   And have you participated in obtaining excerpts from those

15  recordings?

16  A.   Yes, I have.

17  Q.   And have they been recorded and captured on a disk?

18  A.   Yes, they are.

19  Q.   Likewise, with respect to Mr. Angel Ortiz, was the same

20  process utilized to capture recordings, both recorded phone

21  calls as well as recordings at meetings, with respect to Angel

22  Ortiz?

23  A.   Yes, they were.

24  Q.   And, again, which chapter was he associated with?

25  A.   The Devon Street Kings.

1   Q.   Did you participate in likewise taking excerpts from

2   lengthier recordings for the purposes of this hearing as well?

3   A.   Yes, I did.

4   Q.   And are those both included on a disk?

5   A.   Yes, both of them are.

6            MR. MacKINLAY:  May I approach again, Your Honor?

7            THE COURT:  Yes.

8   Q.   I'm showing you a disk and ask you if you recognize it?

9   A.   Yes, I do.

10  Q.   What do you recognize it to be?

11  A.   This is the disk we just described containing the videos

12  or edited short clip videos of Jeremia Medina and Angel Ortiz.

13  Q.   Do the excerpts of the audio and on one occasion video --

14  multiple occasions video, fairly and accurately reflect the

15  segment of the video and/or audio that were the entire

16  recording?

17  A.   Yes, they do.

18           MR. MacKINLAY:  Your Honor, I offer it into evidence

19  as Exhibit 2.

20           THE COURT:  So marked.

21           (Government Exhibit 2 received in evidence.)

22  Q.   Special Agent, those files were also provided on the --

23  loaded onto the trial laptop here in the courtroom; is that

24  right?

25  A.   That's correct.

1   Q.   Have you had a chance to review them to ensure their

2   accuracy?

3   A.   Yes, I have.

4   Q.   I wanted to start by discussing with you an incident that

5   occurred on December 10th, 2018, which is Paragraph 275 of the

6   detention affidavit.  Do you recall that?

7   A.   Yes, I do.

8   Q.   Can you describe as a background what occurred generally

9   and what then is captured on the video?

10          MR. GILLESPIE:  Your Honor, may I have a minute to

11   find the....

12          THE COURT:  It's Paragraph 275.

13          MR. MacKINLAY:  275, Your Honor.

14          THE COURT:  I'm sorry?

15          MR. MacKINLAY:  Page 98 of the affidavit.

16   Q.   By way of background, in the investigation what was

17   occurring at that particular time?

18   A.   So this was a recording --

19          MR. GILLESPIE:  May I have a minute, Your Honor, to

20   get this screen in proper position, if I know how to do it.  Do

21   you know how to do that?

22          MR. MacKINLAY:  More?

23          MR. GILLESPIE:  No, I think that's good.

24          Thank you, Your Honor.

25          THE COURT:  Okay.

1    Q.    Again, what was occurring during the course of the

2    investigation on that date?

3    A.    So this was a recording through a CCTV surveillance video

4    that was set up in the actual garage at King Street by Latin

5    King members that apparently use this garage for a meeting.

6    Q.    King Street in what city?

7    A.    New Bedford.

8    Q.    Okay.  And who, based on your information, was present

9    during the meeting at the garage?

10   A.    So there was several Latin King New Bedford chapter

11   members present to include Jorge Rodriguez, Jose Rodriguez,

12   Jeremia Medina, Xavier Soto, as well as other -- Michael Cotto,

13   and several other New Bedford chapter members.

14   Q.    What was the purpose of the meeting?

15   A.    So the purpose of this meeting was to address an issue

16   with an individual that was spreading rumors about Jose

17   Rodriguez, King Stutter, as well as Jeremia Medina, King

18   Sweepy.

19   Q.    Was there -- when you obtained this video, did you or

20   another agent review it in conjunction with a cooperating

21   witness to assist in identifying individuals involved?

22   A.    Yes, we did.

23   Q.    Okay.  And based upon that, have you reviewed it in its

24   entirety?

25   A.    Yes, I have.

1    Q.   Are you familiar with the individuals that are depicted on

2    the video?

3    A.   Yes, I am.

4    Q.   Now, what occurs on the video?

5    A.   So in this video members can be seen -- New Bedford

6    chapter members can be seen beating the individual with fists

7    and feet as well as one member pulls out a metal bat and hits

8    the individual.

9    Q.   With respect -- focusing now on Mr. Medina, where is he in

10   the video, and what did you observe him doing?

11        MR. GILLESPIE:  Your Honor, can we just watch the

12   video?

13        THE COURT:  No, that's okay.  I can have the testimony

14   and then we'll watch it.

15   A.   So Mr. Medina, he is off camera at the beginning of the

16   video to the left where the individual is being beaten.  You

17   can see him motioning as if he is throwing strikes or kicks at

18   the individual, and then he backs up in the camera view, and at

19   that point the beating continues.  And Michael Cotto a/k/a King

20   Gordo or Gordo, picks up the bat and hits the victim.

21   Q.   How long is the excerpt?

22   A.   It's a short excerpt, less than a minute long.

23        MR. MacKINLAY:  Your Honor, I request permission to

24   play that segment of the exhibit at this time?

25        THE COURT:  Okay.

```
 1                (Video playing.)
 2   Q.   Now, I just want to point out to the Court on the video
 3   the individual that you've identified as Mr. Medina.
 4                MR. MacKINLAY:  Can we go back and play it, where I
 5   actually stopped it, paused.
 6                (Video playing.)
 7   Q.   Do you see Mr. Medina on that part of it?
 8   A.   We need to go a little bit further.
 9                (Video playing.)
10                MR. MacKINLAY:  Pause it, please.
11   A.   So Mr. Medina -- I don't know if I can draw on this.  Is
12   it possible?  No?
13                THE COURT:  No.
14                THE WITNESS:  Okay.
15                THE COURT:  I think you have to do it from the --
16                MR. MacKINLAY:  May he approach?  May he leave the
17   stand, Your Honor, and approach the --
18                THE COURT:  Yes.
19                MR. MacKINLAY:  Thank you.
20   A.   So Mr. Medina can be seen here.
21                THE COURT:  Can you describe what he's wearing?
22                THE WITNESS:  Yes.  So he has a black T-shirt, Your
23   Honor, black pants.  There's a -- it looks like there's some
24   sort of gold fluorescent design on the shirt.
25                MR. MacKINLAY:  Play it again.
```

1              (Video playing.)

2    Q.   Can you see more clearly at this time?

3    A.   Yes, sir.

4              MR. MacKINLAY:  Your Honor, again, could he leave the

5    stand and approach the screen and point out the image of

6    Mr. Medina to the Court?

7              THE COURT:  Go ahead.

8              MR. GILLESPIE:  Your Honor, could he take a position

9    on the floor to the other side because he's blocking my

10   client's view of the --

11             THE COURT:  Can you see?

12             MR. GILLESPIE:  Can you see it now?

13             THE COURT:  There's another screen.  Does he seriously

14   have a problem seeing who he's pointing to or not?

15             MR. GILLESPIE:  No.  I forgot about that screen, Your

16   Honor.  Okay.

17             THE COURT:  All right.  It's okay.

18             (Video playing.)

19             THE COURT:  Can you just explain to me, is this a

20   camera that is set up there by the Latin Kings as a

21   surveillance camera in the garage?

22             THE WITNESS:  Yes, Your Honor.  So this was a camera

23   that was in place, and a CW was able to record the video and

24   audio screen of that CCTV surveillance camera that they had set

25   up in their place.

```
1              THE COURT:  Okay.
2    BY MR. MacKINLAY:
3    Q.   Was there -- in another part of the investigation,
4    referring to Paragraph 276 of the detention affidavit on Page
5    99, was there a recording -- an incident that was captured on
6    recording on February 3rd, 2019?
7    A.   Yes, there was.
8    Q.   Okay.  And what was happening during the course of that
9    incident?  What's your memory and recollection of what
10   occurred?
11   A.   So this was an audio recording collected by CW-9 regarding
12   a beating that had taken place.  On the recording Jorge
13   Rodriguez and other members discuss this beating or violation
14   that was given out, and Jorge Rodriguez makes a remark to
15   Jeremia Medina participating and having blood on his shirt.
16             THE COURT:  What paragraph are you on, did you say?
17             MR. MacKINLAY:  Paragraph 276, Your Honor, of Page 99
18   of the detention affidavit.
19             THE COURT:  Thank you.
20   Q.   And referring to Medina having blood on his shirt as a
21   result of the incident, beating?
22   A.   That's correct.
23   Q.   Did Medina make any statements during the course of that
24   recording regarding that incident?
25   A.   Yes.  He had agreed that he had blood on his shirt, and he
```

1    had to go change as a result.

2    Q.   Did the investigation continue -- and on Paragraph 291,

3    Page 106, was there a trial involving Victim 9 and so-called

4    Philly?

5    A.   Yes, there was.

6              MR. GILLESPIE:  May I have a minute, Your Honor.

7              MR. MacKINLAY:  It's 291 on Page 106, Counsel.

8    Q.   Are you familiar with that incident, Special Agent?

9    A.   Yes, I am.

10   Q.   Describe again what happened during the course of that

11   trial and with particular focus on Mr. Medina's role.

12   A.   Yes.  So this was a trial that was held in Connecticut by

13   the Connecticut chapter of the Latin Kings.  This trial

14   specifically was for two individuals that were in -- one

15   individual that was in very bad standing with the Latin Kings

16   and had numerous attempts on his life over the course of some

17   time.  The other individual was on trial for assisting that

18   individual as well as going outside of his chain of command.

19   Q.   For just a brief moment, you probably should explain what

20   a trial is in the context of the Latin Kings and their

21   organization.

22   A.   Yes.  So the Latin Kings, much like the hearing we're in

23   today, have their own system of trials which are run by crown

24   councils.  Crown councils will hear evidence, testimony that is

25   entered in from Latin King members and ultimately review their

1    bylaws and make a decision on the fate of that individual.

2    Q.   Was Medina participating or present at least during the

3    course of that trial on that day?

4    A.   Yes, he was.

5    Q.   And what occurred?

6    A.   So after the trial the decision was made that Tito, an

7    individual that was involved in this, would be terminated or

8    killed.  He was ultimately -- this did not happen due to CW-9

9    convincing members that they didn't want to catch a body in

10   this location.

11        Additionally, the other individual involved, it was

12   determined that he would receive a head-to-toe or referred to

13   as a pumpkin-head violation by members of the New Bedford

14   chapter.

15   Q.   And what did that consist of?

16   A.   That consisted of a one-minute full-body beating by

17   several members of the New Bedford chapter.

18   Q.   Did Medina participate in that?

19   A.   Yes, he did.

20   Q.   Just to be clear, to go back, with respect to, I believe

21   you said, Tito, that CW-9 was in a position and intervened that

22   prevented him from being killed as a result of the order to

23   kill that was issued at the meeting?

24   A.   Yes, he did.

25   Q.   I want to direct your attention to the date of October

```
 1   24th, 2019, involving a meeting of the New Bedford chapter
 2   where they discuss rival gangs.
 3           MR. GILLESPIE:  I'm sorry, which paragraph is that?
 4           MR. MacKINLAY:  Which is Paragraph 342 of the
 5   detention affidavit, Counsel, located at Page 140.
 6           MR. GILLESPIE:  Paragraph 342?
 7           MR. MacKINLAY:  342, Page 140.
 8           MR. GILLESPIE:  Okay.
 9   Q.   Again, Special Agent, can you set the context for what
10   occurred on that particular meeting in New Bedford?
11   A.   Yes.  So this was a meeting that took place at 104 Tallman
12   in the first-floor rear apartment.  This was an apartment that
13   another Latin King member was currently residing, Natanael
14   Velazquez a/k/a King Nael.  This was a meeting of the New
15   Bedford chapter to address an ongoing war with the Gangster
16   Disciples in New Bedford, who had several days before killed a
17   17-year-old probationary member of the Latin Kings in New
18   Bedford.
19   Q.   During that incident was there a second Latin King member
20   who was also shot and paralyzed?
21   A.   Yes, there was.
22   Q.   So this meeting was, you said, several days after that
23   incident occurred?
24   A.   Yes, it was.
25   Q.   And do you know from the context of the meeting what
```

1   was -- what was discussed?

2   A.   Yes.  So this was a meeting to discuss a few different

3   issues.  One of the issues was a Facebook Messenger chat that

4   the Latin Kings in New Bedford utilized to communicate.

5   Specifically it was designed for if they had an issue with a

6   rival gang member, they can immediately post something to the

7   chat, and then other members could come to assist them.

8   Q.   Okay.  And in particular, there was cautions issued as a

9   result of the chat; is that fair to say?

10  A.   That's correct.

11  Q.   And this was captured on the recording of the meeting as

12  well?

13  A.   Yes, it was.

14  Q.   And was the cooperating witness on this occasion with --

15  utilizing audio-video equipment?

16  A.   Yes, they were.

17  Q.   And is that the second segment under this file that you

18  have excerpted from the entire recording?

19  A.   Yes, it is.

20  Q.   And, again, approximately how long is this?  Several --

21  A.   I'm not sure, but it's several minutes long.

22         MR. MacKINLAY:  Your Honor, I request permission to

23  play the second file relative to this meeting at this time?

24         THE COURT:  Okay.

25  Q.   While that's coming up, was Mr. Medina --

1          (Video playing.)

2     Q.   Special Agent, what's being said, and who is speaking at

3     this point?

4     A.   Currently speaking is the current cacique for the State of

5     Massachusetts for the Latin Kings, Jorge Rodriguez, former Inca

6     of the New Bedford chapter.  He is currently addressing the NFL

7     Facebook Messenger chat and instructing members to not put

8     anything that could potentially incriminate them in the chat.

9     Q.   Is Mr. Medina present during the course of this meeting as

10    well?

11    A.   Yes, he is.

12         MR. MacKINLAY:  Can you play it, please.

13         (Video playing.)

14    Q.   Again, Special Agent, can you describe who is speaking and

15    what they're saying?

16         MR. GILLESPIE:  Objection, Your Honor.

17         THE COURT:  Overruled.

18    A.   So this is still Jorge Rodriguez speaking.  He is again

19    cautioning members that anything put in the chat could be

20    intercepted by law enforcement or outsiders could see it, and

21    therefore, it could implicate them in crimes.

22         (Video playing.)

23    Q.   Again, what's being said at that particular time?

24    A.   Jorge Rodriguez is continuing to advise members not to

25    post anything about guns or murders in the chat.

1           (Video playing.)

2   Q.   Again, what's being said at this juncture?

3   A.   So currently speaking at this juncture is the -- was the

4   current Inca at the time, Jose Rodriguez a/k/a King Stutter,

5   brother of Jorge Rodriguez.  He is indicating to members that

6   they should not be calling him when rival gang members are

7   seen.  There's an active termination on them.  They can go

8   ahead and move on them, shoot them.  They don't need to contact

9   him first.

10          Additionally, Jeremia Medina addresses the group at

11  the end indicating that if he finds out anyone is contacting

12  Mr. Jose Rodriguez in this way, either him, or he says Gordo,

13  who we know to be Michael Cotto, will come see them, and you

14  know what that means.

15          (Video playing.)

16  Q.   And, again, Special Agent, what's the discussion at this

17  juncture?

18          THE COURT:  I didn't hear a word you just said.

19  Q.   Again, Special Agent, what is being said at this juncture?

20  A.   So this is a discussion about who was the proper person in

21  the chain of command to contact regarding shootings or

22  violence, and specifically they address that you need to

23  contact the third, which is the third crown, or the enforcer,

24  which currently at this time was Jeremia Medina.

25          MR. MacKINLAY:  Play it, please.

1              (Video playing.)

2    Q.   Again, what is being said at the last piece of the

3    recording, Special Agent?

4    A.   Again, another member is addressing the group and

5    informing them that they need to know the chain of command and

6    contact the proper individuals for violence.

7    Q.   Did your investigation also link Mr. Medina to narcotics

8    trafficking?

9    A.   Yes, it did.

10   Q.   I want to direct your attention to Paragraph 358, which is

11   included on Page 149 of the affidavit.  Was there a recording

12   of July 18th, 2019, that you're familiar with?

13   A.   Yes, I am.

14   Q.   Again, would you just describe what was occurring that day

15   for context prior to playing it.

16   A.   So this was a recording captured by CW-9 of Roberto Vargas

17   a/k/a King Royalty or Royal, another brother of Jorge

18   Rodriguez, as well as Jeremia Medina a/k/a King Sweepy.  This

19   recording takes place in 238 Davis Street in New Bedford, which

20   was a known stash location or cooking location for Jorge

21   Rodriguez.  On the video you can see Roberto Vargas holding a

22   kilo of cocaine and Jeremia Medina preparing to cook the

23   cocaine to crack cocaine.

24            MR. MacKINLAY:  I request permission, Your Honor, to

25   play the third file.

1          THE COURT:  Go ahead.

2          (Video playing.)

3   Q.   Again, just for the Court, who was holding the white

4   package that you have described as being cocaine?

5   A.   So Roberto Vargas was holding the package.

6   Q.   And who was wearing the colored shirt at the stove?

7   A.   That was Jeremia Medina.

8   Q.   Special Agent, did your investigation also focus on as a

9   target Angel Ortiz?

10  A.   Yes, it did.

11  Q.   And how did you identify Angel Ortiz?

12  A.   Angel Ortiz was identified by CW-3 and captured on

13  numerous audio and video recordings at D5K cypher meetings.

14  Q.   Are you familiar, based on the investigation, with his

15  king name, chapter association, and position within the

16  chapter, if any?

17  A.   Yes, I am.

18  Q.   Can you please describe each to the Court.

19  A.   So Angel Ortiz goes by the king name King Abby.  Most

20  likely it comes from his middle name, Abymael.  He was a

21  current member --

22          MR. SHEA:  Objection, just the speculation part, I

23  think.

24          THE COURT:  All right.  We'll take out where it comes

25  from.  But his middle name is Abymael?

1              THE WITNESS:  Abimael, Your Honor.

2              THE COURT:  Okay.  Thank you.

3              MR. MacKINLAY:  And, Your Honor, this is at Paragraph

4    68 of the detention affidavit.  Page 24, Counsel.

5    Q.   What information did you have that provided you with the

6    identity as being a target for King Abby?

7    A.   So the information was provided by CW-3 as well as several

8    audio and video recordings made by CW-3 of D5K chapter

9    meetings.

10   Q.   And did King Abby hold a position in the chapter?

11   A.   He was -- he did not hold a position in leadership.  He

12   was a member of the chapter.

13   Q.   I want to turn your attention to the date of October 14th,

14   2018.  Was there on that particular day a D5K cypher meeting

15   that was recorded?

16   A.   Yes, there was.

17   Q.   And is that included on Page 68 of the detention affidavit

18   which is reflected in the paragraph starting at 212?

19   A.   Yes, it is.

20   Q.   By way of context again, can you describe what is

21   occurring for the context of this meeting during the

22   investigation?

23   A.   Yes.  So this was a D5K chapter cypher meeting to address

24   an ongoing issue with the Lucerne Street Dawgz, which is a

25   local gang in Boston based off of Lucerne Street.  Members of

1    D5K had issues with Lucerne Street due to a shooting which had

2    claimed the life of the mother of a D5K probationary member,

3    Lassandro Vasquez.  The individual that was killed went by the

4    name of Chi Chi or Chi Chi.  During this meeting Angel Roldan

5    a/k/a King Big A, the current -- the second in command of the

6    state at the time had called into the meeting to address the

7    issue due to the fact that there was violence within the

8    Department of Corrections put into play by Frutuoso Barros

9    a/k/a King Fruity against Lucerne Street regarding this

10   incident.

11   Q.   So that's the set of the meeting.  Was Mr. Ortiz present

12   at this meeting?

13   A.   Yes, he was.

14   Q.   And, again, was there an excerpt of the recording that you

15   have prepared?

16   A.   Yes.

17   Q.   And is it approximately three or four minutes long?

18   A.   Yes, it is.

19          MR. MacKINLAY:  Your Honor, I request permission to

20   play the first segment regarding Mr. Ortiz, which is also

21   included on Exhibit 2.

22          THE COURT:  Yes.

23          (Video playing.)

24   Q.   Again, who is principally speaking, and do you see

25   Mr. Ortiz in the video at this point?

1    A.   Yes.  So Mr. Ortiz is currently speaking.  He is sitting

2    on the couch in the corner of the room in the white T-shirt.

3    Q.   Again, could you indicate sitting or laying back on the

4    bed?

5    A.   He is sitting.

6    Q.   And what is being discussed at this point in the meeting?

7    A.   Prior to the excerpt that is provided here, during the

8    phone call Angel Roldan had demanded targets and locations for

9    Lucerne Street gang members.  At this point members are

10   discussing and identifying those individuals and where they

11   potentially could be.

12   Q.   For what purpose?

13   A.   To target or shoot them.

14        MR. SHEA:  I know it's supposed to be left for cross,

15   but that's just an outrageous interpretation of what my client

16   just said.  I mean, he's essentially saying the guy was my

17   celly in jail.  How is that describing where you should go to

18   shoot him?

19        THE COURT:  The witness can testify as -- put it more

20   in context, okay?

21   Q.   Describe how is it that you know that their plan was to

22   identify targets of Lucerne for the purposes of retaliation

23   against them?

24   A.   Yes.  So earlier in the recording Angel Roldan

25   specifically asked for targets, indicating he has two hitters

1    on deck.  At this point the members discuss another ongoing

2    issue and then end the phone call and begin discussing and

3    identifying Lucerne Street gang members.

4              (Video playing.)

5    Q.   Special Agent, what's being said at this point in the

6    meeting?

7    A.   So Angel Ortiz is identifying members of Lucerne Street

8    Dawgz.  Additionally he offers up another way to identify the

9    individuals is through YouTube or videos that are available on

10   line.

11             MR. MacKINLAY:  Play it again.

12             (Video playing.)

13   Q.   Special Agent, what's being discussed at this point in the

14   meeting?

15   A.   So at this point in the meeting members are discussing

16   what actions to take.  Another individual who is off the camera

17   currently, Ramon Guerrero a/k/a King Ray, can be heard saying

18   that they should wait for King Nene or Matthew Palacios, as he

19   stepped out of the room, due to the fact that this is his area

20   of expertise, and Matthew Palacios was currently the enforcer

21   for the D5K chapter.

22             MR. MacKINLAY:  Can you play it, please.

23             (Video playing.)

24   Q.   Again, what's being discussed at the conclusion of the

25   meeting?

1    A.    Before the meeting was interrupted by hotel staff, you can

2    hear another member offer that one of the girlfriends of a

3    Lucerne Street member resides in Nasty's building, "Nasty"

4    being King Nasty a/k/a Dante, also known as Dante Lara, a

5    member of the D5K chapter.

6    Q.    Did the investigation continue and also record a meeting

7    on January 12th, 2019?

8    A.    Yes, it did.

9    Q.    Using cooperating witnesses as well?

10   A.    Yes, it did.

11   Q.    And is that reflected in Paragraph 255 of the detention

12   affidavit?

13   A.    Yes, it is.

14   Q.    Which is located at Page 87?

15   A.    Yes.

16   Q.    Again, just by way of context, what is occurring in this

17   meeting and who's present?

18   A.    So this is another D5K cypher meeting that was held or

19   hosted by the Inca Wilson Peguero a/k/a King Dubb.  In

20   attendance at this meeting was second in command for the state

21   of the Latin Kings, Angel Roldan a/k/a King Big A.  During this

22   meeting King Big A addresses current members, Latin King

23   members that are not reporting to the D5K chapter, and

24   therefore, are in violation and had previously had green lights

25   ordered on them by Wilson Peguero.

1    Q.    Who was that?

2    A.    So several members are discussed, but specifically the

3    member that individuals were most concerned with was Omar

4    Nogueras a/k/a King Loyal.

5    Q.    Was there further discussion about the green light on King

6    Loyal and his associates?

7    A.    Yes.  So Angel Roldan begins to address the room.  Angel

8    Roldan indicates that members should approach the individuals

9    not reporting, and if they are not going to get down, they

10   should lay down.

11   Q.    Was there further discussion regarding shooting?

12   A.    Yes.  A little bit later in the meeting Angel Roldan is

13   still addressing the group, and says that if individuals are

14   going to keep popping crowns members should shoot them in the

15   leg.

16   Q.    Following the meeting did the investigation uncover

17   additional information and evidence concerning phone calls to

18   the cooperating witness?

19   A.    Yes, it did.

20   Q.    So, again, by way of context, what occurred with respect

21   to the phone calls following the 1/12/19 meeting?

22   A.    Shortly after the meeting there was a series of two phone

23   calls placed to Cooperating Witness 3 asking for phone numbers

24   and locations of individuals that were currently not reporting.

25   Q.    And in particular, was that related to the meeting that

1  Angel Roldan had just conducted?

2  A.   Yes, it was.

3  Q.   Was there a particular target discussed in the phone

4  calls?

5  A.   Yes.  So specifically on the phone calls individuals

6  discuss members to include a member named Cruz and a member

7  named Pistol and a member previously discussed Omar Nogueras,

8  Loyal.

9  Q.   How is Cruz, for example, connected to the other two, in

10  particular Loyal?

11  A.   So Cruz was an associate of Loyal and had -- members

12  believed joined his renegade chapter of Latin Kings and in bad

13  standing.

14        MR. MacKINLAY:  Your Honor, I request permission to

15  play the first of these calls at this time, which is on the

16  second file, relative to Angel Ortiz?

17        THE COURT:  Okay.

18        (Audio playing.)

19  Q.   Who's speaking at that time?

20  A.   Angel Ortiz.

21  Q.   And the second person is the cooperating witness?

22  A.   That's correct.

23        (Audio playing.)

24  Q.   Special Agent, what's being said and by whom at this time?

25  A.   So the first individual discussed is an individual named

1    Pistol, who was previously discussed in the meeting, and Angel

2    Ortiz indicates that they're in Cathedral, which is Cathedral

3    Heights, where he was believed to hangout or reside.

4              MR. MacKINLAY:  Can you play it, please.

5              (Audio playing.)

6    Q.   Again, Special Agent, at the end of this first call, what

7    is being said and by whom?

8    A.   So Mr. Ortiz is looking for an individual, Cruz, who was

9    in bad standing.  The CW suggests that they call an individual

10   that goes by the name King Bebble to find out where Cruz is at.

11   And Angel Ortiz asked for a number for King Bebble.

12   Q.   Was there a second call to the cooperating witness that

13   same day?

14   A.   Yes, there was.

15   Q.   When in relation to the one we just listened to?

16   A.   It was shortly after.  I'm not sure of the exact time.

17   Q.   Is that the final file on the -- that you have put onto

18   the files for Angel Ortiz?

19   A.   Yes, it is.

20             MR. MacKINLAY:  Your Honor, I request permission to

21   play the final call.

22             (Audio playing.)

23             MR. MacKINLAY:  Pause it, please.

24   Q.   What's being said at that time and by whom?

25   A.   So at this time Angel Ortiz was requesting the phone

1  number for Bebble again in order to locate King Cruz, and when

2  he is informed that he doesn't have a number, the CW suggests

3  that he contact Loyal for the number.  At which point he

4  becomes frustrated because there is currently a green light out

5  on Loyal and they're supposed to be looking for him as well.

6              MR. MacKINLAY:  Can you play it?

7              (Audio playing.)

8  Q.   Again, at this point what's being said, Special Agent, and

9  by whom?

10 A.   At this point Angel Ortiz is again growing frustrated

11 because he wants the proper names and locations so that he can

12 carry out the instructions of Angel Roldan from the meeting

13 previously discussed.

14             MR. MacKINLAY:  Keep playing.

15             (Audio playing.)

16 Q.   Finally, Special Agent, what's said at the end of the call

17 and by whom?

18 A.   So at this point Angel Ortiz indicates that he's not going

19 to be riding around with straps looking for individuals until

20 they get their facts straight.

21 Q.   What's straps in your understanding of this investigation?

22 A.   Guns.

23 Q.   Did your investigation also reveal that Angel Ortiz was

24 involved in drug trafficking?

25 A.   Yes, it did.

1           MR. MacKINLAY:  Counsel, I direct your attention to

2    Paragraph 263 of the detention affidavit as well as Paragraph

3    69 you previously were aware of, which also is included on Page

4    89 of the detention affidavit.

5    Q.   Directing your attention to June 14, 2018, did you have

6    information relative to this defendant and drug trafficking on

7    that date?

8    A.   Yes, we did.

9    Q.   Describe it for the Court.

10   A.   So we were informed by CW-3 as well as intercepted

11   recorded calls between CW-3 and Angel Roldan regarding some

12   heroin that he was looking to cut.  It is offered up by Angel

13   Roldan that he needs a location to cut, and ultimately the

14   decision is made to contact Angel Ortiz, or he's referred to as

15   Abby on the call, to see if he can assist in providing a

16   location.

17   Q.   Have you listened to the call?

18   A.   Yes, I have.

19   Q.   Are you familiar with the contents of the call and the

20   sequence leading up to it?

21   A.   Yes, I am.

22           MR. MacKINLAY:  No further questions at this time,

23   Your Honor.

24           THE COURT:  So this is recorded, but you're not -- you

25   don't have it today, is that -- is it your testimony that

 1    there's a recording of this?

 2            THE WITNESS:  Yes, Your Honor.

 3            THE COURT:  Are there any reports of this?

 4            THE WITNESS:  I'm not sure.  They're not my reports,

 5    Your Honor, so I don't know if there is a report regarding that

 6    call.  I know there's transcripts of the calls.

 7            THE COURT:  Okay.  Cross-examination.

 8            MR. GILLESPIE:  Thank you, Your Honor.

 9                        CROSS-EXAMINATION

10    BY MR. GILLESPIE:

11    Q.   Good morning, Agent Harvey.

12    A.   Good morning, sir.

13    Q.   Now, you started out by showing the video of the incident,

14    I believe, on December 10th -- well, let me start with

15    something else.

16            So as a result of your investigation into this

17    matter, you're quite familiar with the structure, the rules,

18    the organization of the Latin Kings; is that correct?

19    A.   Yes, sir.

20    Q.   All right.  Fair to say that it's quite an organized

21    structure?  I mean, there are rules for various things and

22    punishments for various things, et cetera; is that correct?

23    A.   That's correct.

24    Q.   Now, to become a Latin King, you have to want to be a

25    Latin King; is that right?

1   A.    That's correct.

2   Q.    Nobody is shanghaied into being a Latin King; is that

3   right?

4   A.    Not to my knowledge, sir, no.

5   Q.    And in order to be a Latin King, you have to be initiated,

6   right?

7   A.    Each chapter has different -- and each state has different

8   processes that they initiate members in, but yes.

9   Q.    And part of that initiation or part of the process of

10  becoming a member is to understand that there are rules by

11  which the organization supposedly operates, right?

12  A.    That's correct.

13  Q.    And I think you've testified -- we can infer from your

14  testimony that it's very important for members to follow the

15  rules, right?

16  A.    That's correct.

17  Q.    In fact, if members don't follow the rules, there's

18  punishment, right?

19  A.    That's correct.

20  Q.    And some of that punishment includes something called a

21  violation; is that right?

22  A.    That can be one of the punishments, correct.

23  Q.    And a violation basically can be anything as mild as just

24  basically a lecture, dressing down, et cetera, to a physical

25  beating; is that right?

1    A.   Traditionally violations start at a physical beating and

2    escalate from there.

3    Q.   Now, the member who is accused of the violation and thus

4    subject to violation has already agreed that he would be so

5    disciplined -- subject to discipline by becoming a member; is

6    that correct?

7    A.   For the current violation they can either accept the

8    violation at the time or can potentially take the incident to a

9    trial or be terminated on the spot depending on what the

10   violation is for.

11   Q.   Okay.  But you said they can either accept the violation

12   or request a trial, right?

13   A.   That is correct.

14   Q.   So if they accept a violation, they're accepting it

15   voluntarily, correct?

16   A.   As a part of the Latin Kings, yes, they are accepting it.

17   Q.   Now, what we saw in the video of the gathering on December

18   10th, 2018 -- by the way, where was that again?

19   A.   That was at the King Street Garage in New Bedford.

20   Q.   In New Bedford, right?

21   A.   That's correct.

22   Q.   Fair to say it's a pretty short video clip, correct?

23   A.   That's correct.

24   Q.   And you, I believe, identified my client, Mr. Medina, as

25   being present at the time?

```
 1   A.   Yes, I did.

 2   Q.   Now, the video clip itself doesn't actually show the

 3   victim, does it?

 4   A.   He is not readily visible on there.

 5   Q.   Right, right.  And so -- for example, you testified to

 6   seeing somebody carrying a long object which you said, I think,

 7   was an aluminum bat?

 8   A.   That's correct.

 9   Q.   All right.  You weren't there, right?

10   A.   No, I was not, but --

11   Q.   You don't know what kind of an object that was, other than

12   the fact that it was long and cylindrical, right?

13   A.   The CW was there and identified it as an aluminum bat.

14   Q.   Okay.  All right.  Uhm.  So -- and the video does not show

15   the victim, supposed victim, the member actually who's there

16   voluntarily being struck by that bat, correct?

17   A.   As I understand, this individual was not a member of the

18   Latin Kings.

19   Q.   Now, previous to that, your testimony was that there was a

20   beating going on, right?

21   A.   That's correct.

22   Q.   Again, we don't see it on the camera, do we?

23   A.   The beating?

24   Q.   Right.

25   A.   I think it is visible on the camera.
```

1    Q.    Well, we see a lot of commotion, but we don't see a

2    beating?

3    A.    We can see individuals throwing strikes as well as an

4    individual --

5    Q.    I'm sorry.  I can't understand you.

6    A.    We can see individuals throwing strikes and kicks as well

7    as a bat being swung at the direction of the victim and a loud

8    metallic clang.

9    Q.    Yeah, we see all that, but we don't see the victim?

10   A.    We don't see him -- no, we don't see him fall.

11   Q.    The victim agreed to the violation; is that correct?

12   A.    In this case, no, because this victim was not a Latin

13   King.

14   Q.    I'm sorry?

15   A.    In this case the victim was not a Latin King.

16   Q.    So you are saying he was there against his will?

17   A.    He was not there against his will.  He had come willingly

18   but was not aware of the violence that was impending.

19   Q.    How do you know that?

20   A.    Per CW-9.

21   Q.    Okay.  I don't think you testified to that, did you?

22   A.    I don't believe that was a question, no.

23   Q.    Now, the next incident you testified to was on February

24   3rd, 2019.  That was an audio recording.  Supposedly that was a

25   discussion about the violation of December 10th, right?

```
 1   A.    No.  This was a different violation.

 2   Q.    This was a different violation?

 3   A.    That's correct, sir.

 4   Q.    A violation which we did not see on video, correct?

 5   A.    That is correct.

 6   Q.    And you testified that during that audio the defendant

 7   agrees that he has blood on his shirt, right?

 8   A.    That he had blood on his shirt, yes, sir.

 9   Q.    That he had blood on his shirt.

10         MR. GILLESPIE:  Your Honor, can we play that audio

11   again?

12         THE COURT:  Was that one of the audios?  I don't

13   believe so.

14         MR. GILLESPIE:  It was Paragraph 276.

15         MR. MacKINLAY:  That's not one of the recordings that

16   we offered, Your Honor.  We had the witness describe that

17   meeting.

18         THE COURT:  That's my memory.

19         MR. GILLESPIE:  Oh, okay.  I thought that was an

20   audio.

21   Q.    Now, you've testified regarding a trial in Connecticut,

22   right?

23   A.    That's correct.

24   Q.    Your CW was present during that trial?

25   A.    That's correct.
```

1   Q.   Now, I don't think we have a video of that, correct?

2   A.   It was not offered as an exhibit, but there is an

3   audio-video recording of that meeting.

4   Q.   Okay.  And two individuals on trial were Philly and

5   somebody referred to as Victim 9; is that correct?

6   A.   That's correct.

7   Q.   And you testified that Mr. Medina was present?

8   A.   That's correct.

9   Q.   Okay.  And you testified that after the trial it was

10  agreed that Tito would be terminated?

11  A.   That's correct.

12  Q.   Who said that?

13  A.   That decision was made by the independent crown council of

14  Connecticut as well as the -- one of the crown council members,

15  King Demon a/k/a Hector Manuel Vega.

16  Q.   Now, "terminated" has a meaning in this organization as

17  well, doesn't it?

18  A.   Yes, it does.

19  Q.   But it doesn't mean simply killing, does it?

20  A.   It depends on the termination.

21  Q.   Yeah.  It can be anything from a slight beating to an

22  actual killing; is that correct?

23  A.   That's correct.

24  Q.   So you don't know whether or not the order to terminate

25  Tito meant kill him?

1   A.   In this case we do know that that is what is meant.

2   Q.   Was he killed?

3   A.   He was not killed as a result.

4   Q.   It was a meeting subsequently that you testified about in

5   New Bedford at 104 Tallman Street, I believe?

6   A.   Tallman Street, that's correct.

7   Q.   There was no recording there, right?

8   A.   There is an audio-video recording of that meeting.

9   Q.   Was that played?

10   A.   It was played.

11   Q.   What were you told about that meeting by the CW?

12   A.   So that meeting was as a result of the ongoing war between

13   the Gangster Disciples and the Latin Kings of New Bedford and

14   to address the members who were -- one that was killed and one

15   that was shot a few days earlier.

16            THE COURT:  Is this October 24?

17            THE WITNESS:  That's correct, Your Honor.

18            THE COURT:  Thank you.

19   Q.   You also testified about some meeting where, I think his

20   name was Jorge Rodriguez, was cautioning members about posting

21   on Facebook, correct?

22   A.   That's correct.  That would be the same meeting we just

23   discussed.

24   Q.   The same meeting?

25   A.   Yes, sir.

1   Q.   Now, do you know if Mr. Medina was present at that

2   meeting?

3   A.   Yes, he was.

4   Q.   We didn't hear him, though, on the tape, did we?

5   A.   Yes, we did.

6        MR. GILLESPIE:  One minute, Your Honor.

7        (Pause.)

8   Q.   You testified about a very brief video in which I think

9   his name is Vargas was holding a package, a Styrofoam package,

10  square container contained in a plastic bag, correct?

11  A.   That's not correct.

12  Q.   Well, what did you see?

13  A.   So that is a plastic container, a plastic bag with

14  suspected cocaine with the stamp "gucci" on it.

15  Q.   So you're saying that the white square object in that bag

16  was the cocaine itself; it wasn't the -- it wasn't a Styrofoam

17  package?

18  A.   That's correct.

19  Q.   And that's based on your cooperating witness's testimony?

20  A.   Among other things, but yes.

21  Q.   All right.  And he was recording that meeting, correct?

22  A.   That's correct.

23  Q.   But fair to say that was a very short clip that you showed

24  us, right?

25  A.   That's correct.

1    Q.    Okay.  And it shows that white object and it shows a

2    stove, and then it ends, correct?

3    A.    In that excerpt of the recording, yes.

4          MR. GILLESPIE:  Thank you.  No further questions, Your

5    Honor.

6          THE COURT:  Mr. Shea?

7          MR. SHEA:  Thanks.

8                         CROSS-EXAMINATION

9    BY MR. SHEA:

10   Q.    We're still in the morning.  Good morning.

11   A.    Good morning, sir.

12         MR. SHEA:  Can I approach and come back liberally,

13   Judge, just for documents?

14         THE COURT:  Yes.

15         MR. SHEA:  I mean, rather than ask you every time.

16         THE COURT:  I thought you were leaving.

17         MR. SHEA:  Huh?

18         THE COURT:  I thought when you said you could walk

19   around you were leaving.

20         MR. SHEA:  Oh, no.

21         THE COURT:  Feel free to approach the witness and go

22   back to your table.  Go ahead.

23         MR. SHEA:  This is the part I've been waiting -- I'm

24   not leaving.

25   Q.    Agent, you were asked regarding Mr. Ortiz; is that so?

1    A.    That's correct.

2    Q.    Okay.  Now, Mr. MacKinlay took you through to excerpts of

3    phone calls, correct?

4    A.    That's correct.

5    Q.    Okay.  What I would like to show you is from the synopsis

6    from Phone Call 1.

7              THE COURT:  What's the date?

8              MR. SHEA:  Sure.  1/12/2019, the start time is in

9    military time, 2003.  So 8:03 to 8:04.

10   Q.    So that's one of the calls he took you through, right?

11   A.    That's correct.

12   Q.    Okay.  And what does it say that the -- you said it was

13   Angel Ortiz.  What does the transcript with the call say?  UM?

14   A.    Yes.  So at the top it says "UM," which --

15   Q.    Please, let me stop you there.

16   A.    Yes.

17   Q.    What's UM stand for?

18   A.    Unknown male.

19   Q.    Okay.  So -- and when was -- at the bottom of that page it

20   seems to be a date of July 5th, 2019, correct?

21   A.    That's correct.

22   Q.    Is it fair to say that that's when it was transcribed?

23   A.    That's incorrect.  That's when it was printed.

24   Q.    Okay.  So at least at that point it's an unknown male on

25   the call, correct?

1  A.   At that point the transcriber, who are independent from

2  the investigators, the person that listens to the call, had

3  typed that, correct.

4  Q.   Right.  But there are other transcripts done where you

5  know the people and you give the transcriber their names,

6  correct?

7  A.   Depending on who was doing the transcription, that's

8  correct.

9  Q.   Okay.  But certainly there are transcripts that exist with

10 accurate names?

11 A.   That is correct.

12 Q.   Okay.  And in this one it says "unknown male," right?

13 A.   The transcriber had listed it as unknown male, that's

14 correct.

15 Q.   Okay.  And then it does say that there's a subscriber to

16 this phone, right?

17 A.   That's correct.

18 Q.   And what's the last name of the subscriber?

19 A.   This subscriber name says Angel Cruz.

20 Q.   Okay.  And is Angel Cruz known to you in this

21 investigation?

22 A.   No.

23 Q.   Okay.  And then it does say that there's apparently a

24 phone number, right?

25 A.   That's correct.

1    Q.    Associated with Angel Cruz, right?

2    A.    That's correct.

3    Q.    And did you get the phone records for Angel Cruz?

4    A.    The phone records for Angel Cruz?

5    Q.    Yeah.

6    A.    Angel Cruz was the subscriber name that came back to the

7    subpoenaed phone number.

8    Q.    Okay.  And so was there anything that indicated that Angel

9    Cruz was Mr. Ortiz in the record?

10   A.    In terms of the record?

11   Q.    Yeah.

12   A.    The record only returns the subscriber name, which can be

13   any name.  It doesn't actually have to be a real name,

14   depending on the mobile provider.

15   Q.    True.  But it also often includes a billing address,

16   correct?

17   A.    It can, depending on --

18   Q.    Do you know if this included a billing address?

19   A.    I do not know if this subpoena did or not.  Like I said,

20   it depends on the telephone provider.

21   Q.    It doesn't depend on speculation.  What I'm asking is did

22   you get specific information regarding this phone, whether it

23   had an accurate billing address, whether it was a person that

24   the phone had for a month or for a year?  Can you tell us that?

25   A.    It was subpoenaed, and this is the name it came back to.

1  Q.   Do you know if the records that came back had an address

2  on it?

3  A.   I do not know that.

4  Q.   Do you know if the subpoena came back showing that that

5  phone was active under the same name for a significant period

6  of time?

7  A.   I do not know.

8  Q.   And at no other -- no point in your investigation have you

9  heard Mr. Ortiz referred to as Mr. Cruz, have you?

10 A.   No, I have not.

11 Q.   You haven't heard from anyone, even your cooperating

12 witness, that Mr. Ortiz uses an alias of Mr. Cruz?

13 A.   No, I have not.

14        THE COURT:  Has that phone been linked to Mr. Ortiz?

15        THE WITNESS:  That phone number was provided by CW-3

16 on numerous occasions, Your Honor.

17        THE COURT:  And linked to Mr. Ortiz?

18        THE WITNESS:  Yes, Your Honor.

19 Q.   Well, with that, you got target telephones, right?

20 A.   That's correct, sir.

21 Q.   And I counted you had a target telephone number ten at

22 least.  So were there more than ten target telephones?

23 A.   There was 12.

24 Q.   12, okay.  And at any point did you seek wiretap or

25 judicial authorization for this call -- for this number that

1    you say links to Mr. Ortiz?

2    A.    Not in this investigation, no, we did not.

3    Q.    Okay.  And so essentially you relied on CW-3 to say that

4    that phone number was related to Mr. Ortiz?

5    A.    As well as listening to other calls, sir.

6    Q.    But at some point did CW-3 identify that voice?

7    A.    Yes, he did.

8    Q.    Okay.  And he's the person who told you that voice was

9    Mr. Ortiz?

10   A.    That's correct.

11   Q.    Okay.  Now, interestingly, the call where the person talks

12   about being strapped, same date, 1/12/2019, that comes in at

13   military time 2008 to 2010, fair?

14   A.    That's correct.

15   Q.    Okay.  So a two-minute phone call.  There's no phone

16   number associated with that call, correct?

17   A.    That's correct.  No phone number registered when it came

18   in.

19   Q.    And there's no subscriber information?

20   A.    That's correct.  Because there is no phone number, we

21   cannot subpoena the phone number that does not exist on the

22   call.

23   Q.    So it looks like whoever is calling in to CW-3 there is

24   using a different phone five minutes later, right?

25   A.    Potentially they could be.

1    Q.    And --

2    A.    Sometimes, well --

3    Q.    And it's potentially a different person, right?

4    A.    I wouldn't say it's a different person, but there are

5    several individuals that can be heard on the call.

6    Q.    So there are several individuals that can be heard?

7    A.    That's correct.

8    Q.    Okay.  And, again, this transcript is called "unknown

9    male," right?

10   A.    That's correct.

11   Q.    And then there's blacked-out parts which are the

12   information for, I take it, CW-3?

13   A.    Those are the redacted portions, yes.  Correct.

14   Q.    Okay.  And this transcript where it says "unknown male,"

15   it doesn't differentiate -- it doesn't say Unknown Male 1,

16   Unknown Male 2, Unknown Male 3, meaning you've mentioned that

17   there were several voices?  It doesn't differentiate?

18   A.    I would have to review the transcript.

19   Q.    Yeah, sure.

20   A.    No, it does not.

21   Q.    Now, I show you a report.  It's not Bates stamped, but

22   it's a part of a packet that the government gave me in

23   discovery.  It's the third page of the first report.  I show

24   this to you.  It's Abraham, last name -- "LNU" means last name

25   unknown, correct?

```
 1   A.    That's correct.

 2   Q.    A/k/a King Abi, right?

 3   A.    That's correct.

 4   Q.    But it's A-b-i, right?

 5   A.    That is correct.

 6   Q.    Okay.  And the name appearing above it is Angel Roldan,

 7   Big A, right?

 8   A.    That's correct.

 9   Q.    And it -- and it's a list of ALKQN phone numbers, right?

10   A.    That's correct.

11   Q.    And the last four digits on that King Abi are 8717,

12   correct?

13   A.    That's correct.

14   Q.    But that's not Angel Ortiz, is it?

15   A.    That is a different individual.

16   Q.    It's a different King Abi, correct?

17   A.    That's correct.

18   Q.    And anywhere in the 900 pages of paperwork that were

19   turned over in discovery -- did you review those before

20   testifying today?

21   A.    Yes, I did.

22   Q.    Okay.  Is there a single place, one place, that refers to

23   Mr. Ortiz as not just Abby but King Abby?

24   A.    I can't recall in 900 pages whether his name would be as

25   King Abby or just Abby or --
```

1    Q.   And the Appalachian King, is that important for any

2    reason?

3    A.   Yes.  It would denote a member.

4    Q.   Okay.  And -- so in this report the King Abi is a

5    different individual?

6    A.   Correct.

7    Q.   Now, let me show you the government's exhibit from today,

8    one of them regarding Mr. Ortiz.  It is an -- and it's Bates

9    number 19.  "FNU," first name unknown, right?  "LNU," last name

10   unknown, right?

11   A.   That's correct.

12   Q.   A/k/a Abby but spelled A-b-b-y, correct?

13   A.   That's correct.

14   Q.   And this is one of the reports that -- it's regarding a

15   meeting on October 14th, 2018, right?

16   A.   That's correct.

17   Q.   And it's regarding one of the meetings Mr. MacKinlay had

18   you testify about, right?

19   A.   That's correct.

20   Q.   Okay.  Now, in the affidavit regarding this meeting -- let

21   me get that.

22           Now, this is the 190-page affidavit for detention,

23   right?

24   A.   That's correct.

25   Q.   And you testified about Paragraph 212, which is the

1  10/14/18 recording, right?

2  A.   That's correct.

3  Q.   Okay.  And in the affidavit, which is now in evidence, it

4  talks about how the meeting was held so D5 members could

5  discuss the murder of Chi Chi by a Lucerne Street gang member,

6  right?

7  A.   That's correct.

8  Q.   Meaning they were upset that somebody's mother had been

9  killed by Lucerne Street, right?

10  A.   That's correct.

11  Q.   Okay.  And then the thing that's included in the affidavit

12  is during the meeting Guerrero said "I'm with it, fuck, those N

13  words, they dipped my N word's mom," right?

14  A.   That's correct.

15  Q.   Okay.  And that's what they quote about from him saying,

16  right?  Did I read that accurately?

17  A.   You read that accurately, correct.

18  Q.   Okay.  Now -- and that is taken from this report that you

19  went through.  I'm switching back to the eight-page report.

20  That's taken from Page 2 of that report, right, what Guerrero

21  says, right?

22  A.   That's correct.

23  Q.   And that's at 6:19 p.m., correct?

24  A.   Approximately 6:19 p.m.

25  Q.   That's what it says, approximately 6:19 p.m., right?

1  A.    Yes, sir.

2  Q.    And what's it say at approximately 6:29 p.m.?  Could you

3  read that paragraph.

4  A.    Sure.  "At approximately 6:29 p.m., Palacios a/k/a Nene

5  and Matos a/k/a Iche, arrive in Room 209 with Lassandro, Abby,

6  O-Block, Izzy, and these members were searched upon entry into

7  the room."

8  Q.    Okay.  And so after that inflammatory statement that was

9  found in the affidavit was made, ten minutes later Abby arrives

10 at the meeting, correct?

11 A.    That is how that report reads, but --

12 Q.    Well, do you have any reason to think your fellow agent

13 didn't write an accurate report?

14 A.    I do not, but in reading that report, the time is not

15 accurate.

16 Q.    Well, you have mechanisms for fixing inaccuracies in

17 reports, correct?

18 A.    Yes.  You can file a supplemental report.

19 Q.    Do you see any supplemental report regarding what I just

20 went through?

21 A.    I do not know if there is one, no.

22 Q.    Okay.  Now, let's go to this alleged drug interaction,

23 Page 24, Paragraph 68 and 69.  So, first off, you said that

24 there was a phone conversation, right?

25 A.    Several phone conversations, correct.

1   Q.   Right, but -- meaning regarding this particular drug --

2   it's not a transaction, but say cutting up of these particular

3   drugs?

4   A.   That's correct.

5   Q.   Okay.  And -- but the conversation is between Angel Roldan

6   and CW-3, right?

7   A.   On some of the phone calls, that's correct.

8   Q.   Okay.  Did you review a particular phone call with

9   Mr. Ortiz regarding this particular transaction?

10  A.   Yes, I did.

11  Q.   And you reviewed it for this hearing -- in preparation for

12  this hearing?

13  A.   I have viewed it in the past.  I have not viewed it in

14  preparation for this hearing, no.

15       MR. SHEA:  I'd ask that that be turned over, Judge,

16  because it's relevant to the area, and it was alluded to by the

17  government but only as to Mr. Roldan and the CW-3.

18       THE COURT:  Mr. MacKinlay, is there a recording of

19  this conversation involving this defendant?

20       MR. MacKINLAY:  It's my understanding from the direct

21  examination that the witness testified there was a recording of

22  the conversation.

23       THE WITNESS:  That's correct.

24       THE COURT:  Then I would expect it to be turned over.

25       MR. MacKINLAY:  I'll make that happen today, Your

```
 1    Honor.
 2              THE COURT:  Thank you.
 3    Q.   And -- now, this reads that Mr. Ortiz was present, right?
 4    A.   That's correct.
 5    Q.   And then it says he assisted, right?
 6    A.   That's correct.
 7    Q.   Do you have -- now, one of the things we saw already on
 8    this -- not involving Mr. Ortiz but a video of someone
 9    preparing -- allegedly preparing drugs, right?
10    A.   That's correct.
11    Q.   Do you have any such video for this?
12    A.   There was no audio-video recording of that meeting, no.
13    Q.   There's no audio-video recording?
14    A.   That's correct.
15    Q.   Even though you were alerted on the phones by Mr. Roldan,
16    correct?
17    A.   We're not live listening to the calls.  So, no, we were
18    not alerted until after the fact.
19    Q.   So did -- the CW-3 didn't alert you until after the fact,
20    correct?
21    A.   He notified us shortly after, but I was not --
22    Q.   No.  Let's stop there.  He notified you shortly after,
23    correct?
24    A.   That's correct.
25    Q.   That means he didn't notify you before?
```

1    A.   If he did not have the opportunity, I don't know.  I was

2    not with the office at that time.

3    Q.   So you weren't with the office at the time?

4    A.   No.

5    Q.   So the idea that he might not have had the opportunity is

6    your own creation, correct?

7    A.   I have no idea.  I was not an agent at the time.

8    Q.   Are you working from a report?  Did he give you -- did you

9    read a report that said he didn't have the opportunity?

10   A.   I don't know if there is a report that says that.

11   Q.   Let's not go into the field of speculation.

12          MR. MacKINLAY:  Objection, Your Honor.

13   Q.   Did you read --

14          THE COURT:  No, no.  Objection overruled.  Just answer

15   the question, okay?  Don't -- we don't need the speculation or

16   defensiveness.  He's asking you is there a report, and to your

17   knowledge, did -- was there prior notice of this meeting?

18          THE WITNESS:  To my knowledge, I do not know if there

19   was prior notice, and I don't know if there's a report that

20   addresses it.

21          THE COURT:  Okay.  You got your answer.  Now move on.

22          MR. SHEA:  Okay.

23   Q.   And is it fair to say that the preferred way of doing

24   things within your agency is to be told by your informant

25   before they're going to do a drug deal?

1    A.    If the opportunity presents itself, yes.

2    Q.    Okay.  So if there's no opportunity presenting itself,

3    they're free to do drug deals on their own without informing

4    you until later?

5    A.    No, not without further admonishments they are not.

6    Q.    Are they admonished not to do drug deals unless they

7    inform you?

8    A.    They're admonished to notify us as soon as they are able

9    to.

10   Q.    Please just answer the question.

11          Are they admonished not to participate in drug deals

12   unless they inform you first?

13   A.    They are admonished not to purchase it in any criminal

14   activity unless they notify us.  Yes, they're required to

15   notify us.

16   Q.    Okay.  Do you have any evidence that CW-3 informed you or

17   anyone at your agency prior to participating in this drug deal?

18   A.    I do not know, as I previously stated in my testimony,

19   whether that is the case or not.

20   Q.    So then, if he did not, then he violated the admonishments

21   of your agency, correct?

22          MR. MacKINLAY:  Objection.  He said he doesn't know.

23          MR. SHEA:  He knows --

24          THE COURT:  The objection is sustained, and I'm not

25   sure that's his testimony.  What -- let me ask you.  If there

1    is not an opportunity to notify you, is the CW permitted to

2    engage in a criminal activity?

3            THE WITNESS:  Per the admonishments, Your Honor, if

4    the CW is not in a position to immediately notify us or cannot

5    get ahold of us, they are to essentially -- if they can

6    prevent -- like, if it's an act of violence, if they can

7    prevent it, they attempt to prevent it in their own way.  But

8    due to the nature of some of these acts and some of the

9    incidents, sometimes it is difficult for them to extract

10   themselves from the situation or notify us due to the presence

11   of other members.

12   BY MR. SHEA:

13   Q.   Well, okay.  Are you able to inform us if there is any

14   report -- it's in the affidavit here, but in the 890 pages of

15   material and additional things you went through with

16   Mr. MacKinlay in preparation for this hearing, is there any

17   report regarding this June 14th, 2018, CW-3, Roldan, heroin

18   meeting?

19   A.   Not that I'm aware of, no.  There's line sheets from the

20   calls.  That's it.

21   Q.   Isn't there supposed to be a report?

22   A.   I don't know if there was a report generated or not.  Like

23   I said, I didn't generate a report.  I don't know if a report

24   was generated.

25   Q.   Well -- and you wouldn't have generated a report because,

1    as I'm basing on your testimony, you're saying you weren't with

2    the agency on June 14th, right?

3    A.    Per my previous testimony, I didn't come to the FBI until

4    November 18.

5    Q.    Okay.  And given that there's no report, do we know where

6    this took place?

7    A.    It was alleged to have taken place, according to the phone

8    calls in the report from the CW-3, at Angel Ortiz's residence.

9    Q.    What address?

10   A.    I do not know.

11   Q.    So we're taking a blanket statement.  What I'm asking is

12   do we even know what town?

13   A.    I don't know.

14   Q.    I would like to show you a report, and it's Bates 80 to

15   87.  In the top right-hand corner it says 6/28/2018, correct?

16   A.    That's correct.

17   Q.    And it says physical surveillance was done on March 23rd,

18   2013, but that's probably a misprint as to the "13"; is that

19   fair to say?

20   A.    That's probably accurate, correct.

21   Q.    Because when you look down here, it says 3/23/2018, right?

22   A.    That's correct.

23   Q.    Okay.  So it says there was a Room 310 outfitted with

24   audio-video surveillance equipment at the Hyatt Place in

25   Braintree, right?

1   A.   That's correct.

2   Q.   Okay.  And flipping ahead, there's a discussion -- now, it

3   doesn't appear that my client is present; is that fair to say?

4   A.   I do not see him listed as a participant, no.

5   Q.   Okay.  But there is a conversation that was audio-videoed,

6   right?

7   A.   That's correct.

8   Q.   And my client comes up in the conversation, right, or at

9   least Abby, A-b-b-y, comes up, right?

10  A.   Yes.

11  Q.   And it says he's on probation, right?

12  A.   That's correct.

13  Q.   It says he's on probation under a lockup, right?

14  A.   That's correct.

15  Q.   And then Roldan says "Abby took a short," right?

16  A.   That's correct.

17  Q.   Quote -- and we're quoting from Roldan here, "Abby had an

18  opportunity to assault Redstar," known to investigators as

19  Rafael Cortez, correct?

20  A.   That's correct.

21  Q.   And took a short meant he didn't assault him, right?

22  A.   I don't know exactly what "took a short" meant.  I'm

23  actually not familiar with that term.

24  Q.   They're saying he didn't do anything to him, right?

25  A.   Like I said, I'm not familiar with "took a short."  I

1    don't know the slang for that term.

2    Q.    Is there anything that indicates that he did anything to

3    this individual?

4    A.    The conversation does not appear that he did anything to

5    that individual, no.

6    Q.    And, again, there's nothing -- he's on probation here,

7    right?

8    A.    That's correct.

9    Q.    So he certainly is not a king, right?

10   A.    He's a probationary member.

11   Q.    Okay.  And can you locate a single report where he becomes

12   a member and a king?

13   A.    I don't know if there's a report documenting that.

14   Q.    Is there a report that even -- other than the detention

15   affidavit and the indictment, is there a single report where

16   they call him King Abby, A-b-b-y?

17   A.    Like I said, I don't know if there's a report where it's

18   written in that manner.  I would have to see a report or a

19   document to know that.

20   Q.    You certainly have access to the reports in this

21   investigation, right?

22   A.    Yes, but I have not committed every single report to

23   memory.

24   Q.    No.  But you were asked to prepare for this hearing,

25   correct?

1    A.    Yes, I was.

2    Q.    Okay.  And you were asked to prepare for this hearing

3    particular to Mr. Ortiz, correct?

4    A.    Yes, I was.

5    Q.    Okay.  Now, there were a number of reports that capture

6    D -- and Devon Street is referred to often as D5K; is that

7    right?

8    A.    That's correct.

9    Q.    So they're kind of interchangeable, Devon Street

10   Kings/D5K; is that fair?

11   A.    That's correct.

12   Q.    Now -- for instance, Bates 64 to 68, "CHS" -- confidential

13   human source, right?

14   A.    Correct.

15   Q.    -- "indicated that D5K chapter was also ordered to attend

16   this cypher," right?

17   A.    That's correct.

18   Q.    And it was April 21st, 2018, right?

19   A.    That's correct.

20   Q.    And the entry date, the report date was May 1st, right?

21   A.    Yes, it was.

22   Q.    Okay.  And they list who was present, right?

23   A.    That's correct.

24   Q.    And no Abby, right?

25   A.    I would have to read it.

1    Q.    Take mine.

2    A.    It does not appear he was present, no.

3    Q.    Okay.  And I did read this correctly where it says they

4    were ordered to be present if they were members?

5    A.    That is what it says there.

6    Q.    Now, there are a number of different reports.  For

7    instance, this one is headlined from CW-3, right?

8    A.    Yes, that's correct.

9    Q.    September 13th, 2018, right?

10   A.    Correct.

11   Q.    Okay.  And it's dealing with a meeting from

12   September 12th, 2018, right?

13   A.    Yes, that's correct.

14   Q.    And it's a cypher of D5K, right?

15   A.    That's correct.

16   Q.    Anywhere in that that you can find Angel Ortiz or Abby?

17   A.    He is not listed as a participant in that meeting.

18   Q.    Okay.  Now, we have -- these are two -- on 2/23 and 467 of

19   Bates, they look like notes, right, or submit notes and

20   statistical accomplishment regarding D5K cypher meeting, right?

21   A.    That's correct.

22   Q.    Okay.  And it took place on 12/21/2018, correct?

23   A.    According to that, yes, correct.

24   Q.    Okay.  Do you have any notes that indicate that my client

25   was present at that meeting?

1    A.   I would have to refer to the report of that meeting.

2    Q.   But there's nothing -- as you sit here today, you have

3    nothing to indicate that he was at that meeting, correct?

4              THE COURT:   Could I have that date again, please?

5              MR. SHEA:   Sure.  12/21/18.

6    A.   Without the report I have nothing.  Like I said, there was

7    several D5K cypher meetings captured during this investigation.

8    I don't know what that meeting entailed or who was present off

9    the top of my head.

10   Q.   But there's nothing there to indicate he was there, right?

11   A.   The excerpt you provided me is only in electronic -- it's

12   an EC.  It's essentially used to submit notes or upload

13   something.  It's not an actual report so there is no content to

14   it.  So reviewing it is not going to help me figure out what

15   occurred during the meeting.

16   Q.   But it's clear that there are notes from that meeting,

17   correct?

18   A.   That's correct, according to the upload.

19   Q.   Okay.  And as you sit here today, Mr. MacKinlay didn't

20   have you get a report from 12/21/18 showing that he was there,

21   correct?

22   A.   That is not one of the reports that was discussed today,

23   no.

24   Q.   268 to 270, so the source is redacted, right?

25   A.   Correct.

1  Q.   The date of the report is 3/8, the date of the contact was

2  3/1, right?

3  A.   That's correct.

4  Q.   And the agents met with the confidential human source,

5  right?

6  A.   That's correct.

7  Q.   Regarding unity day, right?

8  A.   That's correct.

9  Q.   All right.  And it's for people to -- what's unity day?

10  A.   So unity days are events that Latin Kings hold.  All

11  members in good standing are invited, and they are not designed

12  to conduct or discuss Latin King business.  They are mainly for

13  them to bring themselves or their families and meet each other,

14  exchange phone numbers, et cetera.

15  Q.   It appears you have a DVD audio-video from that said unity

16  day, correct?

17  A.   According to the report, yes.

18  Q.   Do you have any information that Mr. Ortiz or Abby is on

19  that video?

20  A.   I can review the report, if you would like to see if it

21  indicates whether he's present.

22  Q.   Thank you.

23          THE COURT:  What's the year of that?

24          THE WITNESS:  2019, Your Honor.

25          THE COURT:  Thank you.

1    A.    No, he was not present at this meeting.

2    Q.    Now, this one is titled -- dated 4/24/2019, right --

3    A.    That's correct.

4    Q.    -- 271 and 275 Bates?  CW-3, right --

5    A.    That's correct.

6    Q.    -- and he's kind of being debriefed or providing

7    information, correct?

8    A.    That's correct.

9    Q.    And he says he attended a D5K chapter meeting in Boston,

10   correct?

11   A.    That's what the synopsis says, correct.

12   Q.    And it appears there's some imported attachment?

13   A.    That is the delta import, which is the actual source

14   reporting document that pertains to this.

15   Q.    And so that would capture the D5 -- his information

16   regarding that D5K meeting in April of 2019, correct?

17   A.    That's correct.

18   Q.    Okay.  So as we sit here today, you haven't referenced or

19   referred to any report from that meeting, correct?

20   A.    We have not discussed any report from that meeting, that's

21   correct.

22   Q.    And Mr. MacKinlay didn't direct your attention to any such

23   report, correct?

24   A.    That's correct.

25   Q.    And as we sit here now, there's no report, that you're

1  aware of, indicating that my client was present at that

2  meeting, correct?

3  A.   I know there's a report.  I'm not sure about the contents

4  of it without reviewing it is.

5  Q.   Okay.  Well, that's -- the report is not in the 890 pages

6  that were provided to defense counsel, is it?

7  A.   Like I said, I don't know if it was or not.

8  Q.   It's not there.

9        So, then again, 5/23/2019, right, it's a meeting with

10  CW-3 regarding a cypher meeting of D5K from 3/17/19?

11  A.   That's correct.

12  Q.   And are you aware of any report regarding that?

13  A.   Yes, I am.

14  Q.   Okay.  And in that report is Mr. Ortiz present?

15  A.   Yes, he is.

16  Q.   And do you have that report today?

17  A.   I don't know if it's here in the courtroom today.  I would

18  imagine it would be in the materials provided.

19  Q.   I don't believe it is.  It's possible I got something

20  wrong, but I don't think so.

21        THE COURT:  I don't have any of it, so I don't know.

22        MR. SHEA:  I'd ask that that be provided.

23        THE COURT:  If it hasn't been produced, it should be.

24        MR. MacKINLAY:  I will check on that, Your Honor.

25        THE COURT:  Thank you.

1   Q.   Now, there was a recording from unity day from 5/26/19,

2   correct?

3   A.   Yes, there was.

4   Q.   And it was provided by a confidential human source,

5   correct?

6   A.   The cover sheet, where's the first page?

7   Q.   Does it say "Recording provided by CHS"?

8   A.   It does, but I don't know which CW without the full

9   report.  I only see three pages here.

10  Q.   Forget the CW.  It's provided by a confidential human

11  source?

12  A.   That's correct.

13  Q.   Okay.  And it seems to list people by their first name,

14  correct?

15        THE COURT:  This is a 5/26 recording but unity day was

16  March?  Is it a different day?

17        THE WITNESS:  Your Honor, from the three pages I can't

18  tell what is -- when the date was or what occurred.

19        MR. SHEA:  Yeah, that's my mistake, Judge.  I didn't

20  copy the whole report.

21  Q.   But I will just say that on this it similarly doesn't

22  mention any Angel Ortiz, correct?

23  A.   He is not detailed to be present during that, no.

24  Q.   Okay.  And then there is a report dated 7/31/2019, "CHS

25  provided structure of D5K cypher meeting, and reported Steven

1    Familia Valdez is aware of the threat against him," correct?

2    A.   That's correct.

3    Q.   Do you know what date cypher meeting he's referring to

4    there?

5    A.   I do not.  Like I said, this is the cover sheet and does

6    not actually list the attachment to the report, so.

7    Q.   Right.  No, I don't have the report.

8         So should a report be generated regarding that?

9    A.   Yes.

10   Q.   Okay.  And the report should tell us whether my client was

11   present?

12   A.   Yes.  It would detail participants of that cypher meeting.

13        MR. SHEA:  I'd ask that that be turned over, Your

14   Honor.

15        THE COURT:  I'm assuming there will be a full

16   production.

17        MR. SHEA:  Well, I thought 900 pages that I was trying

18   to prepare for this hearing with was a full production, at

19   least regarding these kinds of things.

20        THE COURT:  Well, I don't know, but I think pulling

21   out all the documents where your client is not -- was not the

22   subject of direct testimony and your client is not mentioned,

23   my guess is there's a lot of those papers.

24        MR. SHEA:  Well, not when you have a deep -- here's

25   why.  You have -- what I'm trying to do, Judge, and there are a

1  lot of different chapters.  I haven't shown he wasn't at some

2  other chapters.  Their allegation is he's in D5K.  I've led

3  with the report that said you have to attend.

4       THE COURT:  No, I understand what you're doing.  I

5  just don't -- I'm not sure what the scope of the production

6  would have been.

7       MR. SHEA:  Okay.

8       THE COURT:  So I don't know the significance of asking

9  the government to pull this specific document out if there's

10 going to be a bigger production.  Certain of the documents

11 you've requested were the subject of testimony so they should

12 be produced.  The rest I think will be produced in the usual

13 course unless you have a specific need for this one out of

14 order is what I'm asking you?

15      MR. SHEA:  Well, I think it's relevant to this hearing

16 because I'm trying to show that --

17      THE COURT:  There were meetings that he was not

18 present?

19      MR. SHEA:  So far most meetings.

20      THE COURT:  All right.  I understand that, but was

21 this meeting the subject of testimony?

22      MR. SHEA:  No.

23      THE COURT:  Okay.  All right.

24      MR. SHEA:  Yeah.

25 Q.   Fair to say that D5K people not reporting was a concern of

1    the leadership?

2    A.   That's correct.

3    Q.   Okay.  And things were a little complicated in Boston; is

4    that fair to say?

5    A.   Can you further --

6    Q.   Sure.  Meaning it turned out to be another group taking

7    over Boston who were called the Morton Street Bricks?

8    A.   There was another chapter of the Latin Kings that emerged

9    called the Morton Street Bricks, that's correct.

10   Q.   Well, 761.  This is from CW-9.  Apparently it was

11   telephonic, and it says from 7/24/2019, right?

12   A.   That's correct.

13   Q.   Date of contact, 7/22/2019, correct?

14   A.   That's correct.

15   Q.   Last -- next-to-last sentence, "The Mass. ALKQN state team

16   determined that D5K will be dissolved and its remembers will

17   report to the MSB chapter," right?

18   A.   Correct.

19   Q.   And so D5K that you're alleging my client was in was

20   dissolved, right?

21   A.   It was never dissolved, no.

22   Q.   Well, that's the information you had from one of your

23   confidential informants that you're using?

24   A.   That was the information that was put out, and ultimately

25   that issue was resolved by Michael Cecchetelli a/k/a King

1    Merlin, where he decided to have two chapters in Boston.

2    Q.   Let's then look at CW-9, date 7/29/2019, correct?

3    A.   Correct.

4    Q.   Date of contact, 7/29/2019, correct?

5    A.   Correct.

6    Q.   There was a meeting held with this aforesaid Michael

7    Cecchetelli, correct?

8    A.   Correct.

9    Q.   And who was -- what groups were in attendance?  Read it

10   out loud, please.

11   A.   In attendance were ALKQN members from Springfield,

12   Worcester, New Bedford, and Morton Street Bricks.

13   Q.   Morton Street Bricks, where are the Morton Street Bricks

14   from?

15   A.   That would be Morton Street in Boston.

16   Q.   Right.  And this is 7/29, which is literally one week

17   after that same informant had told you that DSK -- D5K would be

18   dissolved into the MSB chapter, right?

19   A.   That's correct.

20   Q.   And then there's a meeting a week later with Cecchetelli,

21   and there's no D5K but there is Morton Street Bricks, correct?

22   A.   This was not a --

23   Q.   Is that what the report says?

24   A.   It does not say that they are present, no.

25   Q.   And it says the Morton Street Bricks are present, doesn't

1    it?

2    A.    Yes, they were present.

3    Q.    Okay.  Now, some of the D5K people supposedly went on to

4    Fitchburg, right?

5    A.    That's correct.

6    Q.    Okay.  Any indication that Mr. Ortiz went on to Fitchburg?

7    A.    That is -- no, there was no information, but that is way

8    before the incident we were just talking about.

9    Q.    Any information that Mr. Ortiz joined the Morton Street

10   Bricks?

11   A.    No, there is no indication.  He was a member of D5K.

12   Q.    Now, you have access to BRIC records, correct?

13   A.    They can be accessed, that's correct.

14   Q.    And what are BRIC records?

15   A.    From what I understand, BRIC records are records within

16   the Department of Corrections -- correct me if I'm wrong.

17   Q.    And in this investigation, some BRIC records were sought

18   regarding gang members associated with Morton Street, correct?

19   A.    That's correct.

20   Q.    Okay.  Did you seek any BRIC records regarding Angel

21   Ortiz?

22   A.    I'm not aware if any records were sought or not.

23   Q.    Okay.  Are you aware if any records exist?

24   A.    I am not aware if any records exist.

25   Q.    273, 274.  This report says "CHS," confidential human

1    source, and it -- I guess to get to the front, CW-3, right?

2    A.    Correct.

3    Q.    He said there was a recorded conversation with King Booboo

4    runs with King Bam of the Morton Street Bricks, right?

5    A.    That's correct.

6    Q.    And King Bam and King Booboo discuss mixing up a bad batch

7    of heroin for a former member of the Dominicans Don't Play,

8    right?

9    A.    That's correct.

10   Q.    And then down at the bottom of the page it lists who

11   people are, right?

12   A.    That's correct.

13   Q.    And King Bam is listed as Angel Calderon, not Angel Ortiz,

14   correct?

15   A.    That's correct.

16   Q.    Okay.  And then King Booboo is CW-9, correct?

17   A.    That's -- I'm not going to testify to the CW as the

18   unidentified.

19   Q.    Well, down at the bottom -- everybody else is listed so --

20         MR. MacKINLAY:  Objection, Your Honor.

21         THE COURT:  Wait, wait, wait.  What's the -- can you

22   just relate this to your client?

23         MR. SHEA:  Well, what I'm about to relate it to is the

24   trustworthiness of informants because -- I'll leave it there.

25   Q.    But let's just say that since King Booboo isn't -- the

1   only gap left is for the informant?

2           THE COURT:  Let's not do this.

3           MR. MacKINLAY:  Objection, Your Honor.

4           THE COURT:  Let's not do this.

5           MR. SHEA:  Well, Judge --

6           THE COURT:  No.

7   Q.   Does the agency continue to work with people who set out

8   to poison people?

9           MR. MacKINLAY:  Objection.  Move to strike.

10          THE COURT:  No, we're not going to go into that.  No.

11          MR. SHEA:  Well, it appears that King Booboo gave a

12  bad batch intentionally to someone that had such information.

13          MR. MacKINLAY:  Again, objection, Your Honor.

14          THE COURT:  That's beyond the scope and way beyond

15  anything that would lead to credibility or not.

16          MR. SHEA:  Well, I think --

17          THE COURT:  No.

18          MR. SHEA:  -- it's relevant because --

19          THE COURT:  You can reserve your objection but stop.

20          MR. SHEA:  I'll stop.

21          MR. MacKINLAY:  Your Honor, I have a standing

22  objection.  I move to strike.  I think it's time to move on.

23          MR. SHEA:  What I'm trying to say is, for instance, in

24  the phone call they're relying on a CW for the identification

25  of the voice.  These are the people they are working with.

1  They continue to work with people they know are actually

2  killing people.

3          THE COURT:  That's fine.  That's an argument you can

4  make.  Now move on.

5  Q.   549 and 550.  So the source is CW-9?

6  A.   That's correct.

7  Q.   And he is providing information regarding a meeting that

8  occurred with Michael Cecchetelli, right?

9  A.   That's correct.

10 Q.   And Cecchetelli is supposedly the head of the whole thing,

11 right?

12 A.   He is the regional East Coast overseer for the Latin

13 Kings.

14 Q.   Okay.  And it's a meeting on February 23rd, right?

15 A.   Yes, that's correct.

16 Q.   And CW-3, his name is blacked out, but he's listed as

17 being a participant in that meeting, right?

18 A.   That's correct.

19 Q.   And he's administratively listed.  The investigators

20 identified CW-3 as being at that meeting, correct?

21 A.   That's correct.

22 Q.   Do you have anything to indicate -- so it's CW-9 telling

23 CW-3 was at this meeting.  Do you have anything to indicate

24 that CW-3 told you he was at this meeting?

25          MR. MacKINLAY:  Objection, Your Honor.  The relevance

 1    of this.

 2            MR. SHEA:  Here's why:  Because I have two reports

 3    that I'm delving into only as to CW-3 because I think CW-3's

 4    reliability at this hearing matters.  The government made his

 5    reliability matter.  And if he's appearing at meetings with the

 6    head of the whole thing and he's not telling them he's at these

 7    particular meetings and the only reason they know he's at these

 8    meetings is because of another confidential witness, that

 9    certainly is worth -- I'm only delving into it at the very

10    surface to show his lack of reliability.

11            THE COURT:  Do you know -- do you know whether there's

12    a report that has that information?

13            THE WITNESS:  Yes, Your Honor, there's a report as

14    well as two recordings of that meeting made by CW-3.  I

15    equipped him with the recording materials myself prior to the

16    meeting.

17            THE COURT:  Okay.

18    BY MR. SHEA:

19    Q.   How about this other meeting; was he there?  Did he tell

20    you?

21    A.   Yes.  He was also equipped with recording devices for that

22    meeting as well.

23    Q.   All right.  Fine.  See, it wasn't that painful.

24            So I show you Mr. Ortiz's employment records and ask

25    you to --

1          MR. MacKINLAY:  Objection, Your Honor.

2    Q.    -- look at the second page.

3          THE COURT:  Why?  Why do you --

4          MR. MacKINLAY:  I haven't seen them.  I don't know the

5    relevance of them.

6          THE COURT:  Is this a new document or this was not

7    produced by the government?

8          MR. SHEA:  Yes.  I'm producing him a copy.  I just got

9    it last night.  It's not earth-shattering.  It's my client's

10   employment records.

11         THE COURT:  From where?

12         MR. SHEA:  From Marcello's, where he's worked for the

13   last year.

14   Q.   And I'm just asking -- showing that he was working during

15   the relevant time period of the alleged phone call, correct?

16         MR. MacKINLAY:  I don't see how that ends up bearing

17   upon anything that this witness would say, Your Honor.  The

18   record speaks for itself.  He can argue for whom -- I'm not

19   objecting to the clearly untimely two hours into the hearing

20   production of it, but I am objecting to using it with this

21   witness.

22         MR. SHEA:  That's fine.  I just ask that it be moved

23   in.

24         THE COURT:  Yes, you can mark it as Exhibit 3.

25         MR. SHEA:  Thank you.

1          (Defendant Exhibit 3 received in evidence.)

2          THE COURT:  But let me understand.  Is that a time

3    sheet, and you're saying -- if he participated in the phone

4    call, it would have been at the same time that he was at work?

5          MR. SHEA:  I can't say that it was exactly the same

6    time.  This captures that he was working and working overtime

7    that particular week.  That's all.

8          THE COURT:  Okay.

9          MR. SHEA:  Just a moment.

10         (Pause.)

11         MR. SHEA:  Nothing else.  Thank you.

12         THE COURT:  Anything from the government?

13         MR. MacKINLAY:  No further questions.

14         THE COURT:  All right.  You may step down.

15         THE WITNESS:  Thank you, Your Honor.

16         THE COURT:  Does the government -- and I need Exhibit

17   2 which -- we have it?  Okay.  Does the government have any

18   further witnesses?

19         MR. MacKINLAY:  No, Your Honor.

20         THE COURT:  Do the defendants have any witnesses?

21         MR. GILLESPIE:  No, Your Honor, but on behalf of

22   Mr. Medina, I would like to advise the Court that he is willing

23   to accept an order of voluntary detention without prejudice.

24         THE COURT:  Okay.  I will enter that order.  If you

25   want the Court to consider proposed conditions, you just file a

1    motion, but the evidence on the hearing is closed.

2              MR. GILLESPIE:  Yes, I will, Your Honor.

3              THE COURT:  Okay.  Mr. Shea, do you want to be heard?

4              MR. SHEA:  Yes.  So what we have so far is this one

5    King Abby -- they list my client as a King Abby in their

6    indictment, but the only King Abby that exists in their

7    paperwork is some other person, not my client.  The paperwork

8    shows my client to be a probationary member of D5K, and there's

9    nothing to indicate he went any further.  In fact, there's a

10   lot of absences from mandatory meetings for a probationary

11   member and so -- and the government, you know, is making these

12   accusations, and I just ask the Court to, and I know you said

13   you would, view my client as an individual.  And if you view

14   him as an individual, he -- they even themselves say he's not

15   in leadership, he's a vested member, and then they can't even

16   prove he's a member.

17             And, you know, what we have -- I showed one report to

18   the agent where they're clearly upset at him because he crossed

19   paths with someone from Lucerne Street and did nothing.  So

20   clearly not violent in any way.  And then the thing they

21   mention about him with Lucerne Street is he says, yeah, the guy

22   was my celly.  Well, it's -- sometime in the past the guy was

23   his celly, and he obviously is at the meeting on that video.

24   We're not denying that.  But it can't be about how to get the

25   celly.  Neither of them are there anymore.  I mean, it's a

1    county institution.  So he's just saying this guy was my celly

2    when we were in jail together, similar to the lack of animus he

3    had when he crossed paths with someone from Lucerne Street

4    before.

5           And then they point to this phone call in which they

6    rely on CW-3, and the phone call records aren't from my

7    client's phone.  Then there's a second call, which is the more

8    serious of the two calls, where it was initially presented --

9    I'm not saying intentionally, but on direct as if it were one

10   voice and my client's voice.  On cross the agent acknowledges

11   that it's numerous male voices, and he acknowledges it's a

12   different phone, and so -- and, you know, those phone calls are

13   only five minutes apart.  So I do think that that's quite the

14   moving target in terms of whether it is in fact my client as a

15   basis for holding him.

16          And then we have this way back, which is June of 2018,

17   is really the only other thing they're pointing to besides that

18   phone call, which is the 100 grams of heroin are being cut up,

19   except there's no report on it.  And they say there's a phone

20   call, but it's never been turned over.  And most of the phone

21   calls are between Roldan and CW-3, and there's nothing to

22   indicate that my client was involved in any kind of

23   distribution in any way.  They're saying he was present while

24   these two who had arranged things over the phone did something

25   with some heroin.

1          THE COURT:  Wait, wait.

2          MR. SHEA:  And, again, you have, as I tried to point

3     out, CW-3 apparently didn't inform them ahead of time that this

4     was taking place.

5          I -- let me just say that I have heard in Federal

6     Court that people being uprated, who supposedly worked for the

7     government, were actually arrested for not providing the

8     information beforehand, that that is a violation of the

9     agreement.  They're not supposed to just go and do things on

10    their own.  Because if he had informed them, then there would

11    be some documentation of where it took place, what town, what

12    address.  They would have tried to put a wire on him or a video

13    on him, as you saw from other things, right?  And they didn't

14    do that.  They have no evidence of it.

15         So -- and the fact that there's no report does kind of

16    boggle the mind.  So I don't think that the case against my

17    client -- those are really the only two things they can point

18    to, and at best one of them is 11 months ago and the other is

19    18 months ago.  And my client's been out working.  He has a

20    child who he supports.  He is still romantically involved with

21    the woman he has the child with.

22         (To Defendant)  How old is the child?

23         And the child is five years old.  He's been involved

24    in the child's life from inception and has supported the child.

25    He has family members here.  He has -- she is here as well as

1   her father, his father-in-law.  I provided you with the pizza

2   place that he's working, Marcello's, where he's worked for a

3   year.  They're holding the job open for him and will take him

4   back to work.

5          I note that Probation requested detention, but one of

6   the things they pointed to is the case and just the

7   over-arching Latin Kings, and the second thing was that he had

8   had a number of jobs over a period of time.  I think -- I

9   interpret that somewhat differently, respectfully, than

10  Probation, which is he's always been employed.  We sat there,

11  and he went through with them jobs he's held since he was about

12  14 years old, and he's always worked.  And so he seeks

13  employment, looks to work, and is trying to do things better.

14         Part of why I emphasized his absences is that I was

15  hearing from family members that he had moved away, that he was

16  living in a stable place, that he was working at Marcello's,

17  all in an effort to distance himself from a prior life, which I

18  don't think was near what the government is trying to paint it

19  as, and that he had successfully done so.  And that's part of

20  what does happen sometimes in these federal cases where they

21  leave people out there is that they actually start to turn

22  things around on their own and do well and don't participate in

23  any criminal activity, and that is the case for my client.

24  And, you know, for --

25         (Unidentified female stumbles.)

1          MR. MacKINLAY:  Are you okay?

2          UNIDENTIFIED FEMALE:  Yeah, I'm fine.

3          THE COURT:  Are you okay?

4          UNIDENTIFIED FEMALE:  I'm fine, Your Honor.

5          MR. MacKINLAY:  Oh, boy, that's a lawsuit, huh?

6          MR. SHEA:  Yeah.

7          THE COURT:  That's because Mr. Quinn is not here.

8   He's our avid watcher of that hole in the ground.  Are you

9   okay?

10          UNIDENTIFIED FEMALE:  Sorry.

11          THE COURT:  All right.  It was dramatic.

12          MR. SHEA:  But all I would say is just to now say he's

13   too dangerous to be in the community when he's been in the

14   community doing well strains credulity, and that -- I know it's

15   the rare person who's getting out from this case, but I think

16   my client actually is someone who can successfully be out in

17   the community, and we'd ask the Court to give him that chance.

18          I don't think Probation has visited the address, but

19   we have the address that he was living at at the time, which

20   isn't implicated in any of this case, as far as we know, which

21   he can go back to and isn't Section 8 implicated.  It's

22   private.

23          THE COURT:  Who is he living with?

24          MR. SHEA:  Well, what he has been doing is he lives

25   with his father, and that's the address we'd ask for.  At times

1   because his father-in-law lives close to Marcello's and

2   sometimes he works until 1:00 or 2:00 in the morning, he's been

3   staying at his father-in-law's at times.  But obviously we'd

4   work with what the Court wanted on that.  But both places --

5   he'd prefer to stay at his father's, I think --

6              (To Defendant)  Father-in-Law?

7              Oh, prefer to stay at his father-in-law's, but both

8   places I think would pass muster with Probation.  Certainly

9   we're willing to be patient for them to have an opportunity to

10   check out the addresses.  If the Court wanted a guardian or a

11   third-party custodian --

12              THE COURT:  Third-party custodian.

13              MR. SHEA:  -- I'm sure we could come up with one.

14              THE COURT:  All right.  I'll let you know.

15              MR. SHEA:  Thank you.

16              THE COURT:  I'm going to take it under advisement, but

17   I do want to hear from the government.

18              MR. MacKINLAY:  Yes, Your Honor.  I'll be brief.  I do

19   agree with Probation that this defendant should be detained on

20   all three grounds that the government has moved under.

21              Generally speaking, relative to witness intimidation

22   and obstruction, that's a general concern of the government's.

23   Backed by the Latin Kings and their enterprise, that is the

24   purpose to do just that, to intimidate witnesses and to act out

25   against anybody that is counter to them, in particular people

1   that are going to cooperate or be snitches to law enforcement.

2       The detention affidavit, which we marked as Exhibit 1,

3   details in no less than ten instances in which witnesses have

4   been targeted for violence and violence submitted against them.

5   We're not suggesting directly attributing it to this defendant

6   other than the ones that we've put evidence before the Court.

7   With that said, it is a fundamental tenet of this gang to work

8   together to assist one another in the enterprise for which he's

9   charged, RICO conspiracy and enterprise, that they're going to

10  help each other with respect to the witnesses, they're going to

11  try to identify them, they're going to try to make sure they

12  don't come to court, they're going to commit violence against

13  them.  I would submit that that's a significant factor with

14  respect to detaining this defendant as well.

15      With regard to the second ground, that is risk of

16  flight, Your Honor, I will talk in a moment about the strength

17  of the case.  I completely disagree with counsel relative to

18  his assessment of the strength of the evidence.  Quite frankly,

19  I won't go through that, but I think it's a very strong case

20  relative to his involvement in the RICO conspiracy, and I will

21  say this, relative to the typical factors of risk of flight,

22  that is, he does have a record, which is somewhat -- has a

23  number of entries on it, including defaults, violations of

24  probation, and in particular, you know, cases that I think

25  would give rise to the enhancements of the sentence he faces

1    under the RICO statute.

2            In particular, one of the instances we talked about

3    that you heard evidence results here in the guideline

4    sentencing range that he faces, which again gives rise for the

5    reason to run and to not appear in court, would be the fact

6    because of the conspiracy to commit murder, which involves a

7    phone call following the Roldan meeting, by my calculation,

8    Your Honor, he starts at the base offense level of 33.  Even if

9    his criminal history category is I, which it's not -- it's

10   probably II or III -- he's looking at 135 months to 168 months

11   on a plea -- excuse me, after trial; 97 to 121 months on a

12   plea.  Again, that's conservative giving him a Criminal History

13   Category of I.  The point is, he faces a significant sentence

14   and has reason, therefore, to depart himself from the area and

15   not follow through coming to court.

16           With respect to the final grounds, Your Honor, the

17   danger imposed by the defendant, generally the affidavit

18   outlines the danger of that as involved with the enterprise and

19   the gang itself, and in particular the clique for which he's

20   associated.  I'm certainly not going to go through incident

21   after incident in detail there, the types of crimes, the

22   violent crimes, the weapons-related crimes.

23           I will focus on the one sequence of events that gives

24   the government tremendous pause relative to his danger to

25   society.  At the so-called Roldan meeting on January 12th that

1    you heard testimony of where there was a reiteration of the

2    green light to kill Loyal and those associated with the

3    renegade gang chapter of the Latin Kings, this is most telling

4    in the sense that Cruz, an associate of Loyal, is targeted by

5    this defendant and two others the same day as the meeting.

6          You've heard the testimony of the agent who described

7    what occurred at the meeting, and you also heard the phone

8    calls, including the phone voice of this defendant, identified

9    by the cooperating witness and also by the agent, as calling in

10   and trying to find out details of where Cruz was and including

11   references on two occasions that they were strapped, which is

12   armed with a weapon.

13         So, in review, he's at a meeting.  The green light is

14   reiterated.  They're told they have to carry these acts out.

15   He gets into a car with two others, and they go search for the

16   people that they're directed to kill, and they have weapons, at

17   least the weapons in the car to do that, and they're frustrated

18   that they can't find the people, keep calling back, it turns

19   out to the cooperating witness, asking for more information.

20   That's the epitome of a conspiracy to commit murder with the

21   actions that follow.  That, in and of itself, Your Honor, and

22   the other evidence of his involvement in the RICO conspiracy

23   set him at a minimum of 135 months in prison.  I would suggest

24   it's a strong case relative to that particular incident, Your

25   Honor.

1              There are other meetings, as counsel goes to great

2      lengths to show, meetings that he was not at, but we also have

3      produced meetings where he was at, where the 10/14/18 meeting

4      we heard description in great detail from the agent of the

5      discussion of murders, of violence, and he's present in that

6      meeting as well.  He's condoning, he's a part of it.  And, in

7      fact, again, at the other meeting, he acted in fact to carry

8      out the will and wishes of the leaders of the chapter.

9              The defendant's criminal record, Your Honor, also

10     supports this.  His conviction, which appears to be a

11     firearm-related conviction, which he did -- I want to get this

12     right -- 18 months in prison for assault and CW, among other

13     charges, weapons charge, which I'm told the weapon was a

14     machine gun.  He also was put on probation, as a result of the

15     CW charge, and violated the terms of that probation as well and

16     was surrendered as well to that violation.

17             The record is not lengthy, but certainly that one

18     charge, one case at Suffolk Superior Court, is very telling in

19     terms of the violence associated with assaulting someone with a

20     weapon, convicted of the charge relative to the serious type of

21     a weapon, incarceration for a significant period of time as

22     well, and this all occurred in 2015.  So it's recent, Your

23     Honor.  And certainly once he got out off probation -- I

24     believe he was actually on probation during the course of the

25     allegations of the conspiracy, which date back to 2009.

1           So I would suggest, Your Honor, the record speaks

2   volumes as a significant factor and a dangerousness that this

3   defendant poses, the evidence against him, including evidence

4   from his lips during the course of meetings, his actions

5   following those meetings all point in one direction, that there

6   are no conditions of release that can be crafted to protect the

7   community.

8           Now, I will make one comment as well regarding the

9   narcotics, because there is evidence before the Court that the

10  defendant was involved in heroin cutting with another member of

11  the gang as well.  Again, there's not a recording of that,

12  there's not the video evidence that you had relative to the

13  other defendant, but you have evidence that there was a

14  recording -- excuse me, before the Court that there was

15  testimony that he was participating in large-scale heroin

16  cutting with one of the other members of the gang.

17          We know that the narcotics is a way to fund the

18  illegal activities of the Latin Kings, and I would submit that

19  that's precisely what he was doing.  That also poses another

20  risk of danger associated with the narcotics trafficking, and

21  of course, the presumption thereto.

22          I would suggest, Your Honor --

23          THE COURT:  Can I -- let me just ask you.  On the 2017

24  charge from Quincy --

25          MR. MacKINLAY:  Yes.

1          THE COURT:  -- assault to murder, that was nolle

2     prossed.  Do you have any information about that?

3          MR. MacKINLAY:  I can't figure that out, Your Honor.

4     We actually were trying to figure out that before the hearing,

5     whether that particular event is what was indicted in Superior

6     Court in Suffolk County.  It doesn't seem likely because it's a

7     separate county, but I don't see any other entry after the

8     indication that it was dismissed to the indictment -- excuse

9     me, dismissed.  So I don't have an understanding of that.  The

10    charges sound similar in a sense that they're firearm-related

11    charges and the discharging of a firearm.

12         THE COURT:  Well, no.  The Suffolk is 2014.  This is

13    2017.

14         MR. MacKINLAY:  But I don't see -- I don't see any

15    other following Superior Court case out of Norfolk County.  The

16    only firearm-related offense is the one from the previous out

17    of Suffolk County.  So we'll endeavor to get the reports of

18    that to see if we can link it back.  And, quite honestly, I

19    can't make heads or tails about whether that is a separate

20    event for which he was initially charged in District Court, not

21    indicted to Superior Court out of Norfolk County, which is all

22    I can tell the Court at this point.

23         THE COURT:  Okay.

24         MR. SHEA:  Quickly, as to Quincy, I would just point

25    out that it didn't even make it to a grand jury presentation,

1  as far as I can tell.

2        THE COURT:  I'm trying to figure out whether the

3  witnesses backed out or if it was a mistake or if they have any

4  information.

5        MR. SHEA:  All I can point to is if a district

6  attorney doesn't have confidence enough to even present it to a

7  grand jury, that usually tells us all we need to know.

8        THE COURT:  Well, it tells us a lot of things.  I

9  don't know what it tells us in this case.

10        MR. SHEA:  Well, nolle prossed in the District Court

11  is something that is somewhat rare.

12        THE COURT:  I'm not going to -- I think I can't do

13  anything with it.  I don't have any information.  That's the

14  question that I had.  He was charged with it.  I don't know

15  whether there was any evidence.  I don't know if a witness

16  backed out.  I don't know if they had picked him up by mistake.

17  I have no idea what went on here.

18        MR. SHEA:  As to just a couple of quick things.  The

19  machine gun out of Suffolk, that's a 35-year mandatory.  My

20  client ended up doing a house of correction bit.  So that just

21  doesn't make sense, what is being claimed there.

22        My client would happily be on a GPS.  I failed to

23  mention that before.  And I just wanted to point out, too, that

24  the government is saying that the guidelines would be for

25  conspiracy to commit murder.  I won't take you through again my

1    version of the phone calls.  I think there's enough to dispute

2    there.  But I would just point out that the meeting is amongst

3    members -- not members, but is a D5K meeting where they're

4    upset at their fellow members.  So this isn't -- I don't want

5    it to get conflated with the Lucerne Street stuff.  The people

6    that whoever is on that phone call are allegedly looking for

7    are fellow members, and so I do think that it's a stretch to

8    say there was a green light to murder.  There was no green

9    light to murder.

10          And Mr. MacKinlay knows better than I the supposed

11   inner workings of the Latin Kings, but there is -- I don't

12   think there's anything that allows for killing other members

13   without some convoluted trial that would have to take place at

14   the highest levels.  And no such thing happened here.

15          So to say that you should hold him based on a

16   guideline range based on something that isn't there, I think is

17   asking too much.

18          THE COURT:  Okay.  Thank you.  I'll take it under

19   advisement.  The defendant remains in custody.

20          THE CLERK:  All rise.

21          THE COURT:  And I'll enter the voluntary order.

22          (Recording ends at 12:54:28)

23

24

25

1            CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Linda Walsh, Registered Professional Reporter

4  and Certified Realtime Reporter, in and for the United States

5  District Court for the District of Massachusetts, do hereby

6  certify that the foregoing transcript is a true and correct

7  transcript of the stenographically reported proceedings held in

8  the above-entitled matter to the best of my skill and ability.

9            Dated this 3rd day of February, 2020.

10

11

12            /s/ Linda Walsh_____

13            Linda Walsh, RPR, CRR

14            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25