UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| V. | ) ) | No. 19-CR-10459-(48)-RWZ |
| JEREMIA MEDINA, | ) ) ) | |
| Defendant | ) ) | |

**DEFENDANT'S EMERGENCY MOTION FOR RELEASE ON
CONDITIONS UNDER 18 U.S.C. § 841(a)(1) AND THE
SPECIAL CIRCUMSTANCES OF THE COVID-19 PANDEMIC**

The defendant in the above-entitled matter, Jeremia Medina, through his attorney, hereby moves this Honorable Court for an emergency order admitting defendant to pretrial release for the reasons stated herein.

**PRELIMINARY STATEMENT REGARDING THE
CURRENT STATUS OF THE COVID-19 PANDEMIC**

As of March 29, 2020, the new strain of coronavirus, which causes COVID-19, has infected 681,706 people, leading to at least 31,882 deaths worldwide.[1] There were 4,257

---

[1] Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard (Mar. 29, 2020, 8:55:56 a.m. EDT), at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.

*See also* World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 62 (Mar. 21, 2020) https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.

confirmed cases of infection in Massachusetts with 44 deaths.[2] On March 11, 2020 the World Health Organization officially classified COVID-19 as a pandemic.[3] On March 13, 2020, President Trump declared a national emergency to address the pandemic.[4] Governor Baker declared a state of emergency in Massachusetts on March 10. To date, the pandemic has caused the Governor to issue at least 21 emergency orders.[5] Those orders range from closing all elementary and secondary schools to prohibiting on-site consumption of food and beverages to restricting visitor access to nursing homes to prohibiting public gatherings of more than 25 people. Id. On March 23 Governor Baker ordered all non-essential businesses to close. *Id.* Governor Raimondo of Rhode Island declared a state of emergency on March 9th and has issued similar orders.[6] The states of California, Connecticut, Illinois, New York and New Jersey have issued "stay at home" or "shelter in place" emergency orders prohibiting non-essential travel and assembly. At the time of the drafting of this motion approximately 84 million Americans are subject to "stay at home" or "shelter in place" orders.

---

[2] https://www.mass.gov/doc/covid-19-cases-in-massachusetts-as-of-march-28-2020/download

[3] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020) at https://bit.ly/2W8dwpS.

[4] Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference (March 13, 2020). https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-conference-3/.

[5] https://www.mass.gov/info-details/covid-19-state-of-emergency.

[6] Governor Raimondo's executive orders are available at https://health.ri.gov/diseases/ncov2019/. See also Eli Sherman, 83 Total COVID-19 cases in RI; Gov Orders Additional Business Closures, WPRI.com (Mar. 22, 2020) https://www.wpri.com/health/coronavirus/raimondo-covid-19-update-sunday/.

Following the lead of government officials, this Court has issued six General Orders relative to coronavirus, including continuing all jury trials that were scheduled to begin before April 27th (General Order 20-2) and continuing all criminal hearings and deadlines other than motions for release or detention for 60 days, unless there is a case-specific liberty or public safety interest. (General Order 20-4). Other measures include postponing grand juries, civil mediation sessions and naturalization ceremonies, and restricting courthouse visitors.

Virtually all of the precautionary measures are designed to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is highly contagious. The Centers for Disease Control and Prevention ("CDC") advise that the virus passes through coughing and by contact with surfaces.[7] New data published in the New England Journal of Medicine found that the highly-contagious "virus can remain viable and infectious in aerosols for hours and on surfaces up to days."[8] To combat transmission, the CDC has issued guidance discouraging gatherings of more than 10 people in one place.[9] The CDC also urges social distancing—every person should remain at a distance of at least six feet from every other person.[10] Proper hygiene, including frequent cleaning of all surfaces and frequent, thorough hand

---

[7] *See* "How It Spreads," Center for Disease Control and Prevention (last accessed 03/21/2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[8] Neeltje van Doremalen, et. al, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med., (March 17, 2020), nejm.org/doi/10.1056/NEJMc2004973.

[9] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[10] *See* supra note 7; see also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-

washing is also recommended.

### A. COVID-19 Presents An Even Worse Threat In High-Risk Settings Like Jails.

The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or those who must interact with them. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. In prison people are confined in close proximity to one another and to the staff. When people must share sleeping areas, dining halls, bathrooms, showers and other common areas, the opportunities for transmission are greater.

The available evidence indicates that the virus may remain on surfaces for up to three days. *See* Neeljte van Doremalen, et. al., *Aerosol and Surface Stability of SARS-CoV2 as Compared with SARS-COV-1*, New England Journal of Medicine (Mar. 17, 2020) ("SARS-CoV-2 was more stable on plastic and stainless steel than on copper and cardboard, and viable virus was detected up to 72 hours after application to these surfaces (Figure 1A)…").[11] In addition, there are reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and ill-equipped. Compounding the problem, many people who are incarcerated also have chronic underlying health conditions, like asthma, diabetes, hypertension or HIV, that place them at elevated risk for contracting serious COVID-19 infections. Incarcerated people have poorer health than the general population, and even at the best of times,

---

social-distancing-and-self-quarantine.

[11] Available at https://www.nejm.org/doi/10.1056/NEJMc2004973.

medical care is limited in federal pretrial detention centers.[12]

### B. The Pod System Design at NCCC Increases the Risk of Infection.

According to Inmateaid LLC, the following describes the typical housing environment occupied by prisoners and detainees at the Norfolk County Correctional Center:

"The Norfolk County Correctional Center is located in Massachusetts and *takes in new arrests and detainees who are delivered daily*… (emphasis supplied)…

The jail is divided into "pods," each of which includes individual cells, common areas, and an outside recreation court — a space bound by towering concrete walls. All meals are approved by a dietitian. Common area tables are made of solid steel with attached four seats. Inmates crowd around the tables playing cards or board games like chess and checkers. Inside the cells, there is only a sliver of a window allows inmates to peer out. There are two to three inmates per cell, The jail is crowded at about 90 percent capacity and this population varies day-to-day sometimes over-crowded. There are a number of people who arrive at the jail actively or recently drunk or high, or arrive with injuries from fights/assaults that led to their arrest, and/or are mentally ill with no other place for law enforcement to deliver them. This makes the intake process challenging for the jail's staff and its medical personnel." [13]

Of special interest in the description is that the pods consist of inside common areas bounded by cells which house two to three inmates each.. Inside the cells, there is only a sliver of a window [which] allows inmates to peer out." "Inmates crowd around the tables playing cards…etc."  These are precisely the close-quarter conditions which are optimal for the transfer of the Covid-19 virus.  It is doubtful that the proper "social distancing" now required (minimum six feet), self-sanitizing (hand washing), and continual cleaning and sanitizing of common area surfaces can be consistently maintained.  Indeed, a large number of infections at NCCC seems

---

[12] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[13]  https://www.inmateaid.com/prisons/norfolk-county-correctional-center

imminent and inevitable. [14], [15], [16], [17]

Although the imminent threat of contagion, with possible deadly consequences, is the most compelling argument for Mr. Medina's release at present, the remainder of this filing demonstrates that he is also an appropriate candidate for release under conditions which will assure his presence in court as needed and provide any necessary protection for the community.

## Background

Mr. Medina has been named in one count of a nine count, 43 page, indictment alleging a conspiracy to conduct enterprise[18] affairs through a pattern of racketeering activity in violation of 18 U.S.C. §962(d) [ "RICO Conspiracy"] Count One; conspiracy to distribute and to possess with intent to distribute cocaine and cocaine base, in violation of 18 U.S.C. §846, Count Two; distribution and possession with intent to distribute cocaine, in violation of 18 U.S.C. §841(a)(1), Count Three; conspiracy to distribute and to possess with intent to distribute fentanyl, in Violation of 18 U.S.C. §846, Count Four; felon in possession of ammunition, in violation of 18 U.S.C. §22(g)(1), Count Five; conspiracy to distribute and to possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846, Count Six; felon in possession of ammunition, in violation of 18 U.S.C. §922(g)(1), Counts Seven and Eight; and felon in possession of firearms

---

14 Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

15 "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

16 *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

17 Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

18 The alleged enterprise is the "Latin Kings" group, sometimes referred to herein as simply "LK".

and ammunition, Count Nine.

Mr. Medina is only charged in Count Two, the cocaine and cocaine base conspiracy. It bears emphasizing that he is not charged with being a member of the racketeering conspiracy in Count One. Equally relevant on the question of release, he is not alleged to be responsible for amount of cocaine or cocaine base which would trigger a mandatory minimum sentence.

Mr. Medina was arrested on December 6, 2019 and has been detained since that time. On the government's motion,[19] a detention hearing was held before this Court on December 19 at which time one witness testified, Special Agent Craig Ryan Harvey of the Federal Bureau of Investigation ("FBI"). At the close of the hearing, the defendant accepted detention without prejudice. Mr. Medina now moves for release on conditions

<b><u>Summary of Relevant Facts</u></b> [20]

**<u>Recording of December 10, 2018 LK Meeting in New Bedford</u>**

The government played an excerpt from a video recording of an alleged Latin Kings meeting held at a garage on King Street in New Bedford, Massachusetts on December 10, 2018. The video was captured by the CCTV surveillance camera installed at the garage. The excerpt showed a gathering of approximately 10 individuals in a group to the left of the screen. There is commotion, shoving and pushing. Then one to three individuals are seen kicking and punching at someone or something off screen. That lasts for approximately 5 seconds and then the group backs off from the left of the screen to the middle. At approximately 7 seconds the person the

---

19  It is anticipated that the government will oppose the motion for release and again request detention because the defendant is charged with a controlled substance offense which is punishable by more than ten years in prison, 18 U.S.C. §3142 (f)(1)(C), poses a risk of flight, §3142 (f)(2)(A), and is a danger to the community, §3142 (e).
20  Defendant does not admit the facts recited herein but includes them as allegations of fact presented by the government at the detention hearing.

witness identified as the defendant is not seen aggressively moving to the attack along with the others, but, rather, is backing away from the melee with a somewhat defensive movement of his arms. [21] Then at 11 seconds another individual runs from the right to the left carrying a long cylindrical stick or pipe in his right hand. While in the crowd he swings it to the left and a metallic thump sound is audible on the video. The defendant immediately seeks to quell the crowd response by separating and restraining individuals to calm them down.

**Recording of Meeting on February 3, 2019 Where Defendant Allegedly Admits to Blood on His Shirt**

The government alleged at the hearing that on a recording of a meeting on February 3, 2019 a co-defendant, Jorge Rodriguez, and other members present, alleged that Mr. Medina had blood on his shirt from a recent beating or violation that was given out. Det. Tr. 21-22; Det. Aff. p. 99, ¶ 276. Witness Agent Harvey agreed with the allegation and added that Mr. Medina admitted the same on the recording. But the government did not play the recording nor could the undersigned find that specific conversation on Hearing Exhibit 2, the compact disc containing selected audio and video excerpts.

**October 24, 2019 New Bedford LK Meeting**

The government refers to a meeting of the New Bedford LK chapter convened on October 24, 2019 in New Bedford. A recording of part of the meeting was played in court. On it co-defendant Jose Rodriguez warns the members to be careful about what they say in their Face Book postings and on the telephone. He also emphasizes that they should have no reason to call him, presumably at any time. Agent Harvey testified that Mr. Medina threatened violence during the meeting:

---

21 Defendant does not admit that he is the person made reference to.

> "Additionally, Jeremiah Medina addresses the group at the end indicating
> that if he finds out anyone is contacting Jose Rodriguez in this way, either him,
> or he says Gordo, who we know to be Michael Cotto, will come see them,
> *and you know what that means.*"
>
> Det. Tr. 27.

While Mr. Medina does not concede that his voice is on the recording, he does definitively assert that the last phrase, *"and you know what that means."* is not heard on the recording. In other words, the statement was not a threat.

**Drug Manufacturing Segment July 17, 2018**

This is a 19 second video clip which seems suspicious but does not necessarily inculpate Mr. Medina. It shows alleged LK member Roberto Vargas holding a large plastic bag containing a flat Styrofoam packet approximately 10 by 6 inches. He taps it with his knuckles. The focus of the camera then briefly shows a male with dark hair, beard and glasses standing at a stove about 10-12 feet away. He adds a short spurt of tap water into a metal sauce pan that he holds in his right hand.

**Defendant's Personal History**

Mr. Medina is 29 years old and single. He was born in New Bedford. He did not graduate from high school but has obtained his GED diploma. He has two children ages 10 and 3 years old.

At the time of his arrest Mr. Medina was employed part time at Sincere Cuts, a hair salon on Acushnet Avenue in New Bedford. He cleaned the salon 3-4 days per week and was paid $60. Previously he worked full time for six months for Rupert Granthem in a firewood and kindling business in the New Bedford area. He stopped because he was injured on the job. Prior to that he worked full time for nine months at Sid Weiner & Sons Co. in New Bedford packaging

9

dried fruits.

**Defendant's Prior Record**

Mr. Medina has the following adult criminal convictions:

2011    Poss w/intent to distribute heroin, Bristol County Superior Court; sentenced to three years to three years and one day;

2008    Possession w/intent to distribute cocaine base, Third District Court, New Bedford; sentenced to 2.5 years to the House of Correction with 18 months suspended;

2006    Possession with intent to distribute Class B for which he received three years probation.

**Argument**

**Applicable Law**

The undersigned anticipates that the government will move, *inter alia,* on the following grounds for an order continuing Mr. Medina's detention until this case is resolved either by trial or plea. The presumed basis will be pursuant to 18 U.S.C. § 3142(f)(1)(C)(defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act"); § 3142 (f)(2)(A)("a serious risk that [the defendant] will flee"); and § 3142(e)(rebuttable presumption of risk of flight and danger to the community).

Mr. Medina is subject to the rebuttable presumption contained in 18 U.S.C. § 3142 (c)(1)(3) that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community". The burden shifts to the defendant to show "*some* evidence to the contrary". United States v. O'Brien, 895 F.2d 810, 815 (1st Cir. 1990)(emphasis supplied). But the government must provide "clear and convincing evidence" to

support the presumption of dangerousness. 18 U.S.C. § 3142 (f)(2)(b); see also United States v. Patriarca, 948 F.2d 789 (1st Cir. 1991).

Although, the evidence adduced at the detention hearing, as recited above, cannot be termed insubstantial, that is only one factor that the Court must consider under § 3142(g). Perhaps the more important issue is the question whether the conditions proposed by the defendant will eliminate any danger to the community or the risk of flight. With GPS electronic monitoring, random drug testing and the prospect of random searches at any moment there is no risk that Mr. Medina would pose a threat to anybody. He will not be meeting with any questionable persons at his friend, Zulieka Perez's modest apartment in New Bedford. *See infra.* He will not be able to leave her apartment except for work, medical and lawyer appointments, and to attend proceedings in court. He does have enough of an employment history for the court to be optimistic about his work prospects when released on conditions. He has three prior drug convictions for distribution of small quantities of opiates and cocaine. But based on the evidence seen in this case to date, it is impossible to say whether Mr. Medina will be subject to a mandatory minimum sentence based on drug quantity. Without a specific allegation as to the triggering weight in the indictment and proof beyond a reasonable doubt to a jury, no mandatory minimum is foreseeable. Alleyne v. United States, 570 U.S. ___, 133 S.Ct. 2151, 2155 (2013). Apart from that, he has not been indicted in the far more serious RICO conspiracy in Count One of the Indictment.

Raymond Patriarca was the New England mob boss for a vast underworld network involved in, *inter alia,* loan sharking, extortion, and drug dealing. Those activities were verified by the defendant's own admissions as recorded on Title III intercepts. Yet, perhaps largely

11

because he was not facing a mandatory minimum sentence, the First Circuit upheld his release on conditions by the district court which included electronic monitoring and home confinement. Patriaca, supra at 948 F.2d at 793. Defendant submits that he is in a similar position: the allegations against him regarding drug dealing are indeed troubling. But they are still just allegations. He is not convicted. He retains the presumption of innocence. And to detain him in jail for a year or more pending a resolution of this case is not necessary to protect the public. As in Patriarca, the combination of electronic monitoring and home confinement is more than adequate to insure non-flight and to protect the community.

**Proposed Conditions of Release**

The defendant proposes the following conditions to assure his appearance in court as required and the safety of any person and the community:

1. That he be subject to home confinement with permission to leave only for work, medical appointments, and attorney client conferences;

2. that, should the Court deem it necessary, he be subject to GPS electronic monitoring;

3. that he reside with his friend, Zuleika Perez, at 130 Eugenia Street, Apt. 2, New Bedford, MA 02745;

4. that he maintain steady employment, or, if not employed, diligently seek employment with any employment interviews to be approved in advance by pretrial services;

5. that he be subject to the third-party custody/surety of Zuleika Perez with whom he shall reside at 130 Eugenia Street, Apt. 2, New Bedford, MA 02745, and who will address his subsistence needs and accompany him to and from court appearances, medical appointments (including her own), and any pre-approved lawyer and/or medical

emergency visits, as long as such trips do not unreasonably interfere with or jeopardize her own employment;

6. that he sign an unsecured appearance bond in the amount of $50,000;

7. that he be subject to random urinalysis/drug screening by the U.S. Department of Probation;

8. that he be subject to random, unannounced searches by U.S. Probation;

9. that he surrender his passport to U.S. Probation if he has one, and not apply for one if he does not have one; and,

10. that he abide by all statutory conditions of release as well as any other conditions of release set forth in 18 U.S.C. §3142(c ) (1) which the Court shall deem necessary.

## Conclusion

For the reasons stated above, the defendant respectfully prays that his motion for release on conditions be allowed.

**DEFENDANTREQUESTS A HEARING ON THIS MOTION**

Respectfully submitted,

**JEREMIA MEDINA,**

By his attorney,

/s/Raymond E. Gillespie
Raymond E. Gillespie, Esquire
B.B.O. #192300
875 Massachusetts Avenue Suite 32
Cambridge, MA  02139
(617) 661-3222
rgillespie1@prodigy.net

13

CERTIFICATE OF SERVICE

    I hereby certify that on March 29, 2020 the foregoing document has been served upon all persons listed in the Notice of Electronic Filing entered in the CM/ECF system in connection with the instant case:

                                          /s/ Raymond E. Gillespie
                                          Raymond E. Gillespie

emergmtnrel032990f